GRAVES v WARNER BROS

Docket No. 226645. Submitted July 9, 2002, at Detroit. Decided October 22, 2002, at 9:10 A.M. Leave to appeal sought.

Patricia Graves and Frank Amedure, Sr., personal representatives of the estate of Scott Amedure, deceased, brought an action in the Oakland Circuit Court against Warner Bros., the Jenny Jones Show, and Telepictures, seeking damages for the wrongful death of the decedent. The decedent was shot and killed by Jonathan Schmitz three days after the decedent and Schmitz taped an episode of the defendants' television program, during which Schmitz was surprised by the decedent's revelation that he had a secret crush on Schmitz. Schmitz was embarrassed and humiliated by the experience. The plaintiffs alleged that the defendants essentially "ambushed" Schmitz when they taped the show after intentionally withholding from Schmitz that the true topic of the show was same-sex crushes, and that the defendants never attempted to determine before the show the effect the surprise would have on Schmitz. The plaintiffs alleged that the defendants should have known that their actions would incite violence, and that they breached an affirmative duty to prevent or refrain from placing the decedent in a position that would unnecessarily and unreasonably expose him to the risk of harm, albeit the criminal conduct of a third person. The jury returned a verdict in favor of the plaintiffs, and the court, Gene Schnelz, J., entered a judgment and order awarding the plaintiffs damages. The defendants appealed from that order and posttrial orders denying their motions for judgment notwithstanding the verdict, a new trial, or remittitur.

The Court of Appeals *held*:

A person has no duty to protect another from the criminal acts of a third party where, as in this matter, there is no special relationship between the plaintiffs and the defendants or the defendants and the third party. The defendants had no duty to anticipate and prevent the act of murder committed by Schmitz. There was no evidence that the criminal act was a reasonably foreseeable consequence of the defendants' actions. The defendants owed no duty as a matter of law to protect the decedent from the criminal acts of Schmitz that occurred three days after the taping of the show. The

judgment must be reversed, the order granting the judgment must be vacated, and the matter must be remanded for entry of a judgment and order in favor of the defendants.

Judgment reversed, order vacated, and case remanded.

MURPHY, P.J., dissenting, stated that the jury was properly allowed to determine whether the actions of Schmitz were foreseeable, thus giving rise to a legal duty of the defendants to protect the decedent from third-party criminal action that foreseeably resulted from the defendants' actions. The principles regarding the duty to protect another from the criminal acts of third parties and the necessity of a special relationship do not apply in cases such as this concerning misfeasance (active misconduct causing personal injury) instead of nonfeasance (passive inaction or the failure to protect others from harm). This action focuses on the defendants' active misconduct that allegedly created a risk of foreseeable harm to the decedent. It is appropriate under the unique circumstances of this case to consider Schmitz' personal history in determining the foreseeability of his act of violence. The judgment and order should be affirmed.

*Fieger, Fieger, Schwartz & Kenney, P.C.* (by *Geoffrey N. Fieger, Ven R. Johnson,* and *Tammy J. Reiss*), for the plaintiffs.

*Feeney Kellett Wienner & Bush, P.C.* (by *James P. Feeney, Sarah A. McLaren,* and *Paul L. Nystrom*) (*Patricia J. Boyle,* of counsel), for the defendants.

Amici Curiae:

*Honigman Miller Schwartz and Cohn* (by *Herschel P. Fink, Cynthia G. Thomas,* and *Dean M. Googasian*) for Detroit Free Press, Inc., National Broadcasting Company, Inc., ABC, Inc., CBS, Inc., and Fox Broadcasting Company.

Before: MURPHY, P.J., and GRIFFIN and METER, JJ.

GRIFFIN, J. Defendants appeal as of right from the entry of judgment in the amount of $29,332,686 following the jury's verdict in plaintiffs' favor in this wrongful death action. We reverse the judgment,

vacate the court's order, and remand for entry of a judgment and order in favor of defendants, holding that under the circumstances defendants owed no legally cognizable duty to protect plaintiffs' decedent from the homicidal acts of a third party.

I

The instant case has its origins in the tragic murder of plaintiffs' decedent, Scott Amedure, in March of 1995 by Jonathan Schmitz, who was ultimately convicted of second-degree murder. The facts underlying the highly publicized criminal case are set forth in this Court's decision, *People v Schmitz*, 231 Mich App 521, 523; 586 NW2d 766 (1998), which addressed Schmitz' original appeal of his murder conviction:

> This case arises from defendant's killing of Scott Amedure with a shotgun on March 9, 1995. Three days before the shooting, defendant appeared with Amedure and Donna Riley in Chicago for a taping of an episode of the Jenny Jones talk show, during which defendant was surprised by Amedure's revelation that he had a secret crush on him. After the taping, defendant told many friends and acquaintances that he was quite embarrassed and humiliated by the experience and began a drinking binge.
>
> On the morning of the shooting, defendant found a sexually suggestive note from Amedure on his front door. Defendant then drove to a local bank, withdrew money from his savings account, and purchased a 12-gauge pump-action shotgun and some ammunition. Defendant then drove to Amedure's trailer, where he confronted Amedure about the note. When Amedure just smiled at him, defendant walked out of the trailer, stating that he had to shut off his car. Instead, defendant retrieved the shotgun and returned to the trailer. Standing at the front door, defendant fired two shots into Amedure's chest, leaving him with no

chance for survival. Defendant left the scene and tele-
phoned 911 to confess to the shooting.

Following a jury trial, Schmitz was found guilty of
second-degree murder and possession of a firearm
during the commission of a felony; however, this
Court reversed the conviction and remanded the case
for a new trial on the basis of an error concerning
peremptory challenges and jury selection. *Schmitz,
supra.* On remand, Schmitz was again found guilty of
second-degree murder and felony-firearm and sen-
tenced to twenty-five to fifty years' imprisonment for
the murder conviction. His conviction and sentence
were affirmed by this Court in *People v Schmitz,*
unpublished opinion per curiam of the Court of
Appeals, issued January 22, 2002 (Docket No.
222834).

In the wrongful death action now before this Court,
plaintiffs Patricia Graves and Frank Amedure, Sr., as
personal representatives of the estate of Scott
Amedure, deceased, alleged that Schmitz shot and
killed Amedure as a direct and proximate result of
the actions of the present defendants, the Jenny
Jones Show (the show), its owner, Warner Bros., and
its producer, Telepictures.[1] Plaintiffs essentially con-
tended that defendants "ambushed" Schmitz when
they taped the episode of the show in question,[2]
intentionally withholding from Schmitz that the true
topic of the show was same-sex crushes and never
attempting to determine, before the show, the effect

---

[1] Jonathan Schmitz, the sole original defendant in this case before
plaintiffs amended their complaint to add the present defendants, was dis-
missed from the suit as a result of a settlement agreement.

[2] The taped segment was never broadcast.

the ambush might have on Schmitz. Plaintiffs alleged that defendants knew or should have known that their actions would incite violence, with the sole purpose of the show being the increase in television ratings, and that defendants had an affirmative duty to prevent or refrain from placing plaintiffs' decedent in a position that would unnecessarily and unreasonably expose him to the risk of harm, albeit the criminal conduct of a third person. Plaintiffs maintained that the show breached its duty and foreseeably subjected plaintiffs' decedent to an unreasonable risk of harm, ultimately resulting in his death.

Defendants' motions for summary disposition and a directed verdict were denied by the trial court, which opined that there were genuine issues of material fact regarding duty and foreseeability, negligence, and causation. Following extensive trial proceedings, a jury returned a verdict in plaintiffs' favor, and a judgment was subsequently entered thereon awarding plaintiffs $29,332,686 in damages. The trial court denied defendants' posttrial motion for judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur. Defendants now appeal.

II

In defendants' first issue on appeal, we are confronted with the cornerstone of this case—whether defendants owed a duty to plaintiffs' decedent to protect him from harm caused by the criminal acts of a third party, Jonathan Schmitz. Defendants argue that they owed no such duty and that the trial court erred in denying defendants relief as a matter of law where plaintiffs failed to show a duty to prevent Schmitz' violent conduct. We agree.

Motions for summary disposition, a directed verdict, and judgment notwithstanding the verdict are reviewed de novo. *Badalamenti v William Beaumont Hosp*, 237 Mich App 278, 284; 602 NW2d 854 (1999); *Meagher v Wayne State Univ*, 222 Mich App 700, 708; 565 NW2d 401 (1997); *Turner v Mercy Hosps & Health Services of Detroit*, 210 Mich App 345, 348; 533 NW2d 365 (1995); *Jenkins v Southeastern Michigan Chapter, American Red Cross*, 141 Mich App 785, 792; 369 NW2d 223 (1985).

A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. Under subsection C(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. The trial court should grant the motion if the affidavits or other documentary evidence show that there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), and (G)(4). *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999); *Quinto v Cross & Peters Co*, 451 Mich 358; 547 NW2d 314 (1996).

In reviewing a trial court's decision on a motion for a directed verdict, this Court must examine the evidence and all reasonable inferences that may be drawn from it in a light most favorable to the nonmoving party. *Clark v Kmart Corp*, 465 Mich 416, 418; 634 NW2d 347 (2001); *Mason v Royal Dequindre, Inc*, 455 Mich 391, 397; 566 NW2d 199 (1997). Only if the evidence so viewed fails to establish a claim as a matter of law should the motion be granted. *Clark, supra* at 418-419. The same standard applies in reviewing

motions for judgment notwithstanding the verdict. *Orzel v Scott Drug Co*, 449 Mich 550, 557-558; 537 NW2d 208 (1995).

Questions about whether a duty exists are for the court to decide as a matter of law. *Mason, supra; Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997); *Scott v Harper Recreation, Inc*, 444 Mich 441, 448; 506 NW2d 857 (1993). The fundamental principles concerning the threshold issue of duty in a negligence action are well established and have been set forth in detail on numerous occasions by our courts. See, generally, *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000); *Maiden, supra; Murdock, supra; Buczkowski v McKay*, 441 Mich 96, 100-101; 490 NW2d 330 (1992); *Friedman v Dozorc*, 412 Mich 1, 22; 312 NW2d 585 (1981); *Moning v Alfono*, 400 Mich 425, 437; 254 NW2d 759 (1977); *Krass v Tri-County Security, Inc*, 233 Mich App 661, 667-668; 593 NW2d 578 (1999); *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 203; 544 NW2d 727 (1996). Briefly reiterated, a negligence action may be maintained only if a legal duty exists that requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm. *Maiden, supra* at 131-132. This analysis requires a determination whether the relationship of the parties is the sort that a legal obligation should be imposed on one for the benefit of another. *Id.; Friedman, supra*. In determining whether a duty exists, courts examine different variables, including

> foreseeability of the harm, existence of a relationship between the parties involved, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of

preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach. [*Krass, supra* at 668-669.]

See also *Buczkowski, supra* at 100-101; *Terry v Detroit*, 226 Mich App 418, 424; 573 NW2d 348 (1997). Of particular import to the present appeal is the principle that, in general, there is no legal duty obligating one person to aid or protect another. *Krass, supra* at 668. Moreover, an individual has no duty to protect another from the criminal acts of a third party in the absence of a special relationship between the defendant and the plaintiff or the defendant and the third party. *Murdock, supra* at 54; *Buczkowski, supra* at 103-104; *Smith v Jones*, 246 Mich App 270, 275; 632 NW2d 509 (2001); *Krass, supra* at 668-669; *Marcelletti v Bathani*, 198 Mich App 655, 664; 500 NW2d 124 (1993). The rationale underlying this general rule is the fact that "[c]riminal activity, by its deviant nature, is normally unforeseeable." *Papadimas v Mykonos Lounge*, 176 Mich App 40, 46-47; 439 NW2d 280 (1989). Our Court in *Papadimas, id.* at 47, quoting Prosser & Keeton, Torts (5th ed), § 33, p 201, emphasized that " '[u]nder all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.' " As further explained by our Supreme Court in *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988):

> In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has

been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another.

Social policy, however, has led the courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant. . . . The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety.

See also *Ross v Glaser*, 220 Mich App 183, 186-187; 559 NW2d 331 (1996); 2 Restatement of Torts, 2d, § 315, p 122.

"Such a special relationship must be sufficiently strong to require a defendant to take action to benefit the injured party." *Murdock, supra* at 54. Examples of the requisite "special relationship" recognized under Michigan law include a common carrier that may be obligated to protect its passengers, an innkeeper his guests, an employer his employees, owners and occupiers of land their invitees, a doctor his patient, and business invitors or merchants their business invitees. *Id.*; *Buczkowski, supra* at 103-104; *Krass, supra* at 670-671; *Marcelletti, supra* at 664; *Bell & Hudson, PC v Buhl Realty Co*, 185 Mich App 714, 718; 462 NW2d 851 (1990); *Moore v St Joseph Nursing Home, Inc*, 184 Mich App 766, 768; 459 NW2d 100 (1990). In this context, our courts have established a duty of reasonable care toward only those parties who are " 'readily identifiable as [being] foreseeably endangered.' " *Mason, supra* at 398, quoting *Murdock,*

*supra* at 58. See also *Jenks v Brown*, 219 Mich App 415, 421; 557 NW2d 114 (1996); *Marcelletti, supra* at 665. As the *Mason* Court noted, " 'Readily' is defined as 'promptly; quickly; easily.' " *Mason, supra* at 398, quoting *The Random House College Dictionary* (rev ed).

In its most recent pronouncement in this regard, our Supreme Court, in *MacDonald v PKT, Inc*, 464 Mich 322; 628 NW2d 33 (2001), revisited the issue of a merchant's duty to protect business invitees from the criminal acts of third parties and substantially narrowed the scope of the duty owed by a premises owner to his invitee. The plaintiff in *MacDonald* brought an action against the defendant PKT, Inc. (Pine Knob), for injuries suffered during a concert at the defendant's theater as a result of sod being thrown by other concertgoers. She alleged that the defendant was negligent in failing to provide proper security, failing to stop the performance when it should have known that continuing the performance would incite the crowd, failing to screen the crowd to eliminate intoxicated individuals, and by selling alcoholic beverages. The Court held that merchants have a duty to respond reasonably to situations occurring on their premises that pose a risk of imminent and foreseeable harm to identifiable invitees; however, the duty to respond is limited to reasonably expediting the involvement of the police, and there is no duty to otherwise anticipate and prevent the criminal acts of third parties. The Court stated in pertinent part:

> To summarize, under *Mason* [*v Royal Dequindre, Inc, supra*], *generally merchants* "have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." *Id. at 405*. The duty is

*triggered by specific acts occurring on the premises that
pose a risk of imminent and foreseeable harm to an iden-
tifiable invitee.* Whether an invitee is readily identifiable as
being foreseeably endangered is a question for the
factfinder if reasonable minds could differ on this point.
See *id.* at 404-405. *While a merchant is required to take
reasonable measures in response to an ongoing situation
that is taking place on the premises, there is no obligation
to otherwise anticipate the criminal acts of third parties.*
Consistent with *Williams* [*v Cunningham, supra*], a
merchant is not obligated to do anything more than reason-
ably expedite the involvement of the police. We also re-
affirm that a merchant is not required to provide security
guards or otherwise resort to self-help in order to deter or
quell such occurrences. *Williams, supra.* [*MacDonald,
supra* at 338 (emphasis added).]

The *MacDonald* Court, *id.* at 334, n 10, expressly
overruled that portion of *Mason* that indicated that a
merchant has a duty to take precautions against the
criminal conduct of third persons that may be reason-
ably anticipated. The Court explained that

a merchant has no obligation generally to anticipate and
prevent criminal acts against its invitees. . . . [*W*]e have
never recognized as "foreseeable" a criminal act that did
not . . . arise from a situation occurring on the premises
under circumstances that would cause a person to recog-
nize a risk of imminent and foreseeable harm to an iden-
tifiable invitee. Consequently, a merchant's only duty is to
respond reasonably to such a situation. To hold otherwise
would mean that merchants have an obligation to provide
what amounts to police protection . . . .

A premises owner's duty is limited to responding reason-
ably to situations occurring on the premises because, as a
matter of public policy, we should not expect invitors to
assume that others will disobey the law. *A merchant can
assume that patrons will obey the criminal law.* See *People
v Stone*, 463 Mich 558, 565; 621 NW2d 702 (2001), citing
Prosser & Keeton, Torts (5th ed), § 33, p 201; *Robinson v*

*Detroit*, 462 Mich 439, 457; 613 NW2d 307 (2000); *Buczkow-
ski* v *McKay*, 441 Mich 96, 108, n 16; 490 NW2d 330 (1992);
*Placek v Sterling Hts*, 405 Mich 638, 673, n 18; 275 NW2d
511 (1979). *This assumption should continue until a spe-
cific situation occurs on the premises that would cause a
reasonable person to recognize a risk of imminent harm to
an identifiable invitee. It is only a present situation on
the premises, not any past incidents, that creates a duty to
respond.*

Subjecting a merchant to liability solely on the basis of a
foreseeability analysis is misbegotten. Because criminal
activity is irrational and unpredictable, it is in this sense
invariably foreseeable everywhere. However, even police,
who are specially trained and equipped to anticipate and
deal with crime, are unfortunately unable universally to pre-
vent it. This is a testament to the arbitrary nature of crime.
Given these realities, it is unjustifiable to make merchants,
who not only have much less experience than the police in
dealing with criminal activity but are also without a com-
munity deputation to do so, effectively vicariously liable for
the criminal acts of third parties. [*Id.* at 334-335 (emphasis
in original and added).]

*MacDonald* confirms the long-established rule that
there is no general duty to anticipate and prevent
criminal activity even where, unlike the present case,
there have been prior incidents and the site of the
injury is a business premises. Any duty is limited to
reasonably responding to situations that occur on the
premises and pose a risk of imminent and foreseeable
harm to identifiable invitees, and the duty to respond
is limited to contacting the police.

Logic compels the conclusion that defendants in
this case had no duty to anticipate and prevent the
act of murder committed by Schmitz three days after
leaving defendants' studio and hundreds of miles
away. Here, the only special relationship, if any, that
ever existed between defendants and plaintiffs' dece-

dent, or between defendants and Schmitz, was that of business invitor to invitee. However, any duty ends when the relationship ends, *MacDonald, supra; Murdock, supra* at 54-55; *Williams, supra;* 2 Restatement of Torts, 2d, § 314A, comment c, p 119, and in this instance the invitor/invitee relationship ended on March 6, 1995, three days before the murder, when Schmitz and Amedure peacefully left the Chicago studio following the taping of the episode. Because the evidence, even when viewed from a perspective most favorable to plaintiffs, revealed no ongoing special relationship at the time of the murder,[3] defendants owed no duty to protect plaintiffs' decedent from Schmitz' violent attack on March 9, 1995. The present situation simply cannot, under any reasonable interpretation of the circumstances, be construed as involving an existing special relationship that required defendants to respond to a risk of imminent and foreseeable harm to an identifiable invitee on the premises. *MacDonald, supra.* Consequently, the trial court erred as a matter of law in denying defendants' motions for summary disposition, a directed verdict, and judgment notwithstanding the verdict on the basis of lack of duty, an essential element of any negligence action. *Maiden, supra; Buczkowski, supra.*

Plaintiffs seek to characterize the case as one involving misfeasance, alleging that it was reasonably

---

[3] Plaintiffs argue that the special relationship between defendants and Schmitz and Amedure did not end when Schmitz and Amedure left the show. Plaintiffs analogize to a dramshop action, in which a bar may be held liable for a drunk-driving accident after improperly serving alcoholic beverages to a drunk driver even though the driver at the time of the accident was no longer on the premises. However, a dram shop action is statutory in nature and involves serving liquor to a visibly intoxicated person. In this case, Schmitz was neither visibly upset nor dangerous during the taping of the show.

foreseeable that defendants' conduct both in creating and taping an episode on the topic of same-sex crushes and in actively creating a volatile situation would cause Schmitz to murder Amedure. A duty may be imposed in cases of alleged misfeasance where, notwithstanding the general rule that criminal conduct is unforeseeable as a matter of law, the third party's criminal conduct is a reasonably foreseeable consequence of the defendant's actions under the particular circumstances of the case. See, generally, *Williams, supra* at 498; *Ross, supra* at 187; 2 Restatement of Torts, 2d, § 302B, p 88, and § 314A, p 118. However, here, we agree with defendants that such a rationale is wholly unavailing. As previously noted, "[c]riminal activity, by its deviant nature, is normally unforeseeable," *Papadimas, supra* at 46-47, and thus " '[u]nder all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.' " *Id.*, quoting Prosser, § 33, p 201. This case presents no exceptional circumstances warranting departure from that general rule because the evidence at trial disclosed no "reason to expect the contrary" here. Schmitz gave every appearance of being a normal, well-adjusted adult who consented to being surprised on the show by a secret admirer of unknown sex and identity. The evidence of record indicates that nothing in Schmitz' demeanor, or in any of his interactions with the show, put defendants on notice that he posed a risk of violence to others.[4] Reasonable foreseeability is a neces-

---

[4] In this regard, the present case differs substantially from *Ross, supra,* in which a divided panel of this Court found a duty to protect against the criminal acts of a third party based on a theory of misfeasance. The *Ross* majority focused on the defendant's actual knowledge that his son suf-

sary prerequisite to any finding of a duty under Michigan law. *Buczkowski, supra*; cf. *Groncki v Detroit Edison Co*, 453 Mich 644, 657; 557 NW2d 289 (1996) (opinion by Brickley, C.J.). Viewed from a perspective most favorable to plaintiffs, the evidence failed to establish a jury question regarding whether it was reasonably foreseeable that Schmitz would murder Amedure as the natural and probable result of the events on the show. Accordingly, the trial court should have ruled that the murder was not foreseeable as a matter of law and entered judgment in favor of defendants. See *Buczkowski, supra* at 108, n 16 (emphasizing that because there was no evidence of actual notice of "abnormal behavior," the "retailer [who sold ammunition to an allegedly intoxicated person] was entitled to proceed on the assumption that the purchaser would obey the criminal law"), and *Johnson v Detroit*, 457 Mich 695, 712; 579 NW2d 895 (1998) (opinion by Mallett, C.J.) ("defendants could not have suspected that the decedent [who committed suicide in a police station holding cell by using exposed overhead bars that originally had been covered with mesh but were exposed because the mesh had been torn away and had not been repaired despite knowledge of the problem by the police] was suicidal. Consequently, there was no duty to prevent

---

fered from chronic mental problems and of a history of conflicts between his son and some neighbors. In those circumstances, the defendant's decision to hand his son a loaded gun at the moment one such conflict was flaring up was found to entail a foreseeable risk of injury. *Ross, supra* at 188. The *Ross* Court expressly distinguished *Buczkowski, supra*, on the ground that in *Buczkowski*, as here, "there was no evidence that the customer acted in a threatening manner or was legally incompetent." *Id.* at 189. The Court also relied on the "proximity in time between defendant's conduct and the shooting," *id.*, explaining that the shooting occurred "just minutes after defendant handed [his son] a loaded gun," *id.* at 193, not days later and a long distance away as in the instant case.

this unforeseeable death."). To impose a duty based on a misfeasance theory under the circumstances at hand would expand the concept of duty to limitless proportions.

### III

Finally, to the extent the torts of misrepresentation and intentional infliction of emotional distress were either pleaded as alternative theories of recovery or incorporated into the cause of action, over defendants' objection, by the trial court's jury instructions, we conclude that such claims must fail as a matter of law. Amedure's estate cannot recover under the separate tort of intentional misrepresentation, based on defendants' alleged statements to Schmitz, a third party. *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976).[5] The elements of intentional infliction of emotional distress are similarly lacking. See *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 602; 374 NW2d 905 (1985). The mental distress that is the subject of this case was allegedly inflicted on Schmitz, a nonparty to this appeal, not on plaintiffs' decedent. Therefore, this count could not be sustained as a matter of law.

### IV

In sum, we conclude that defendants owed no duty as a matter of law to protect plaintiffs' decedent from the intentional criminal acts of a third party, Jonathan

---

[5] Moreover, assuming the alleged misrepresentation was not a separate cause of action but rather a manifestation of plaintiffs' negligence claim, as already noted, no ongoing special relationship existed between defendants and Amedure on the day of the unforeseeable murder; thus, defendants owed no duty to prevent Schmitz' criminal conduct.

Schmitz, that occurred three days after the taping of
the Jenny Jones Show. While defendants' actions in
creating and producing this episode of the show may
be regarded by many as the epitome of bad taste and
sensationalism, such actions are, under the circum-
stances, insufficient to impute the requisite relation-
ship between the parties that would give rise to a
legally cognizable duty. The trial court therefore erred
in denying defendants' motions in this regard.
Because we find no antecedent duty, we need not
address the other issues raised by defendants on
appeal. Accordingly, we reverse the judgment, vacate
the order, and remand to the trial court with direc-
tions that it enter a judgment and order in favor of
defendants.

Judgment reversed, order vacated, and case
remanded. We do not retain jurisdiction.

METER, J., concurred.

MURPHY, P.J. (*dissenting*). I respectfully dissent
from the majority's opinion because the issue of fore-
seeability concerning the shotgun slaying was prop-
erly placed in the hands of the jury. Viewing the evi-
dence in a light most favorable to plaintiffs, I believe
that the issue was properly left to the jury where the
evidence indicated that Jonathan Schmitz was humili-
ated and devastated on a show scheduled to be
broadcast[1] on national television by defendants
through the revelation of a homosexual crush and
lurid sexual fantasy by Scott Amedure after Schmitz
told defendants that he did not want the crush to be

---

[1] Although the taped segment was never broadcast, presumably
because of the tragic event that unfolded, it is clear from the record that
Schmitz anticipated that it would be.

that of another man, and where defendants nonetheless proceeded with the production of the show, using deceit, sensationalism, and outrageous behavior. I reach my conclusion taking into consideration Schmitz' personal history, which included mental illness, alcohol and drug abuse, suicide attempts, anger management problems, and sexual identity concerns. Certainly, reasonable men and women could differ on whether Schmitz' violent act foreseeably resulted from defendants' actions in manipulating and exploiting the lives, emotions, and sexual identities of individuals for the purpose of producing their television talk show.[2]

The existence of a legal duty in a negligence action is a question of law that this Court reviews de novo. *Cipri v Bellingham Frozen Foods, Inc*, 235 Mich App 1, 14; 596 NW2d 620 (1999). However, where there are factual circumstances that give rise to a legal duty, the existence or nonexistence of those facts must be decided by a jury. *Aisner v Lafayette Towers*, 129 Mich App 642, 645; 341 NW2d 852 (1983). Whether the risk of harm from third-party criminal activity is foreseeable in a particular case is generally a question of fact for the jury. *Holland v Liedel*, 197 Mich App 60, 63; 494 NW2d 772 (1992). Although the question of duty is ordinarily one of law to be decided by the court, where a determination of duty depends on factual findings, those findings must be found by the jury. *Id.* at 65.

---

[2] Although Schmitz first declined to appear on the show, he subsequently decided to appear because, in part, he believed that there was a chance he could meet the love of his life or get back together with his ex-girlfriend.

Defendants' arguments regarding duty arose below in the context of defendants' motions for summary disposition, a directed verdict, and judgment notwithstanding the verdict (JNOV). Each of those motions is reviewed de novo by this Court. *Spiek v Dep't of Trans*, 456 Mich 331, 337; 572 NW2d 201 (1998); *Cacevic v Simplimatic Engineering Co (On Remand)*, 248 Mich App 670, 679; 645 NW2d 287 (2001); *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 260; 617 NW2d 777 (2000).[3]

In *Terry v Detroit*, 226 Mich App 418, 424; 573 NW2d 348 (1997), this Court outlined the following general principles concerning a negligence action:

> In order to establish a prima facie case of negligence, the plaintiff must prove: "(1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach of duty was a proximate cause of the plaintiff's damages; and (4) that the plaintiff suffered damages." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 203; 544 NW2d 727 (1996). Duty is an obligation that the defendant has to the plaintiff to avoid negligent conduct. *Id.* Whether a duty exists is a question of law for the court. *Simko v Blake*, 448 Mich 648, 655; 532 NW2d 842 (1995). If a court determines as a matter of law that a defendant owed no duty to a plaintiff, summary disposition is appro-

---

[3] In evaluating a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in a light most favorable to the nonmoving party. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). In a motion under subsection C(8), all factual allegations in support of the claim are accepted as true and construed in a light most favorable to the nonmoving party. *Maiden, supra* at 119. The test for evaluating a motion for a directed verdict and JNOV is identical. *Smith v Jones*, 246 Mich App 270, 273-274; 632 NW2d 509 (2001). The evidence and all legitimate inferences therefrom must be viewed in a light most favorable to the nonmoving party. *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000).

priate under MCR 2.116(C)(8). *Dykema v Gus Macker Enterprises, Inc*[,] 196 Mich App 6, 9; 492 NW2d 472 (1992).

In determining whether a duty exists, courts look to different variables, including the (1) foreseeability of the harm, (2) degree of certainty of injury, (3) existence of a relationship between the parties involved, (4) closeness of connection between the conduct and injury, (5) moral blame attached to the conduct, (6) policy of preventing future harm, and (7) the burdens and consequences of imposing a duty and the resulting liability for breach. *Buczkowski* [*v McKay*, 441 Mich 96, 101; 490 NW2d 330 (1992)], citing Prosser & Keeton, Torts (5th ed), § 53, p 359, n 24; *Baker, supra.*

One of the initial difficulties in addressing the issues presented in this case is the development of the proper analytical framework. In *Babula v Robertson*, 212 Mich App 45, 52, n 2; 536 NW2d 834 (1995), this Court, quoting *Moning v Alfono*, 400 Mich 425, 437-438; 254 NW2d 759 (1977), stated:

" 'Duty' comprehends whether the defendant is under *any* obligation to the plaintiff to avoid negligent conduct; it does not include—where there is *an* obligation—the nature of the obligation: the general standard of care and the specific standard of care. . . . While the court decides questions of duty, general standard of care and proximate cause, the jury decides whether there is cause in fact and the specific standard of care: whether defendants' conduct in the particular case is below the general standard of care, including—unless the court is of the opinion that all reasonable persons would agree or there is an overriding legislatively or judicially declared public policy—whether in the particular case the risk of harm created by the defendants' conduct is or is not reasonable." [Emphasis in original.]

The *Babula* panel noted that the questions of duty and proximate cause are interrelated because the question whether there is the requisite relationship,

giving rise to a legal duty, and the question whether the cause is so significant and important as to be regarded a proximate cause both depend in part on foreseeability. *Babula, supra* at 53. The first matter that needs to be addressed in properly analyzing the duty issue is whether plaintiffs' action is premised on nonfeasance or misfeasance. I specifically disagree with that portion of the majority's opinion that implicitly focuses on the concept of nonfeasance and the necessarily incorporated principles concerning the duty to protect and the necessity of a special relationship. Such an analysis is inapplicable in this case, a case of misfeasance, not nonfeasance.

In *Ross v Glaser*, 220 Mich App 183, 184-185; 559 NW2d 331 (1996), the personal representative of the decedent's estate brought suit against the father of an adult son after the son, who had a history of mental illness, shot the decedent with a gun provided by the father, which gun was given to the son while he was in an agitated state. This Court reversed the trial court's order granting summary disposition to the defendant. *Id.* at 184. The *Ross* panel, distinguishing misfeasance from nonfeasance, stated:

> In this case, defendant argues that he has no duty to control the conduct of third parties absent a special relationship to them, particularly when the conduct is criminal. He asserts that the father-son relationship is insufficient to establish the required special relationship that would impose a duty on him.
>
> The argument is unavailing. Michigan courts have distinguished active misconduct causing personal injury (misfeasance) and passive inaction or the failure to protect others from harm (nonfeasance). Generally, with respect to nonfeasance, there is no legal duty that obligates a person to

aid or protect another. An exception has developed where a
special relationship exists between the persons.

However, defendant's act of handing a loaded gun to [his
son] was not one of nonfeasance, but rather misfeasance.
Therefore, the special relationship doctrine is inapplicable
. . . . Instead, we must determine whether defendant had a
duty to refrain from handing [his son] a loaded weapon.

\*  \*  \*

As to foreseeability, we determine whether it is foresee-
able that the conduct may create a risk of harm to the vic-
tim and whether the result and intervening causes were
foreseeable. [*Id.* at 186-187 (citations omitted).]

The *Ross* panel concluded that summary disposi-
tion was improper because the likelihood of injury
was high where the mentally ill son was handed a
loaded gun while in an agitated state and in conflict
with antagonists. *Id.* at 189. *Ross* makes clear that
principles regarding the duty to protect another from
the criminal acts of third parties and the necessity of
a special relationship do not apply in cases of
misfeasance.

The essence of plaintiffs' case is premised on mis-
feasance, or active misconduct, as opposed to non-
feasance or passive inaction, which would require a
special relationship, because plaintiffs challenged
defendants' actions in producing the same-sex crush
show.[4] Plaintiffs were not asserting liability based on

---

[4] Defendants argue in their reply brief that plaintiffs did not request a
jury instruction based on misfeasance, nor did the trial court ever rule
that alleged misfeasance was an appropriate basis for imposing liability.
Defendants' argument lacks merit. The trial court and plaintiffs continu-
ally referred to this case as a simple negligence case, or a "classic case of
negligence." The trial court denied the initial motion for summary disposi-
tion, in part, because plaintiffs alleged that the show *actively created a
volatile situation.* In its instructions, the court instructed the jury: "There-

defendants' failure to properly respond to Schmitz' pointing a shotgun at Amedure or failure to actively protect Amedure from Schmitz' actions, nor, on close inspection, is plaintiffs' action premised on defendants' failure to anticipate or prevent Schmitz' criminal act. Rather, plaintiffs' action focuses on defendants' active misconduct *that allegedly created a risk of foreseeable harm* to Amedure, which conduct included lies, deceit, and outrageous behavior. Although it is true that certain aspects of plaintiffs' claims involved inaction, such as the failure to check into Schmitz' background, the claims are all in the context of the manner in which the show was produced, which is a matter of active misconduct.

The majority mistakenly relies on *MacDonald v PKT, Inc*, 464 Mich 322; 628 NW2d 33 (2001), in support of its position. *MacDonald, id.* at 345, specifically reaffirmed our Supreme Court's earlier decision in *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495; 418 NW2d 381 (1988), in which the Supreme Court stated:

> In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and *because such conduct does not create a new*

---

fore, by 'negligence,' I mean the failure to do something that a reasonably careful television production company would do, or *the doing of something* that a reasonably careful television production company would not do under the circumstances that you find existed in this case." Moreover, plaintiffs sought instructions regarding affirmative acts, e.g., misrepresentation and intentional infliction of emotional distress.

*risk of harm to a potential plaintiff.* [*Id.* at 498 (emphasis added).]

In *MacDonald, supra* at 345-346,[5] the Supreme Court, addressing the duty of premises owners concerning the criminal acts of third parties, held:

> [W]e conclude that merchants have a duty to respond reasonably to situations occurring on the premises that pose a risk of imminent and foreseeable harm to identifiable invitees. We hold that the duty to respond is limited to reasonably expediting the involvement of the police, and that there is no duty to otherwise anticipate the criminal acts of third parties. Finally, we affirm that merchants are not required to provide security personnel or otherwise resort to self-help in order to deter or quell such occurrences."

The Supreme Court additionally held that there is no duty to prevent the criminal acts of third parties. *Id.* at 326. The *MacDonald* Court did not hold that there was no duty to avoid actively creating a volatile situation that gives rise to a criminal act.

Defendants focus on the lack of any duty owed to Amedure. Based on the case law cited above, the determination whether defendants owed a duty to Amedure to avoid negligent conduct depended on the conduct at issue in relation to the harm claimed. In other words, the relevant inquiry in determining the

---

[5] The Supreme Court noted the factual circumstances, stating that

[i]n these consolidated premises liability cases, plaintiffs seek to recover for injuries they suffered when fellow concertgoers at the Pine Knob Music Theater . . . , an outdoor amphitheater that offered seating on a grass-covered hill, began pulling up and throwing pieces of sod. We granted leave to address the duty of premises owners concerning the criminal acts of third parties. [*MacDonald, supra* at 325.]

existence of a duty is whether defendants should
have refrained from producing and taping a same-sex
crush show in the fashion it was done and under the
circumstances presented, where plaintiffs asserted
that the conduct caused physical harm and death to
Amedure.[6] In determining whether defendants should
have refrained from producing the same-sex crush
show in light of the alleged harm, we must examine
whether the harm was foreseeable in that context.
Reversal is mandated only if we can rule, as a matter
of law and viewing the evidence in a light most
favorable to plaintiffs, that a violent response by
Schmitz was not foreseeable under the circumstances
of this case.

A duty arises if events are foreseeable. *Groncki v
Detroit Edison Co*, 453 Mich 644, 657; 557 NW2d 289
(1996). "Criminal activity, by its deviant nature, is nor-
mally unforeseeable." *Papadimas v Mykonos Lounge*,
176 Mich App 40, 46-47; 439 NW2d 280 (1989). The
*Papadimas* panel, *id.* at 47, quoting Prosser & Kee-
ton, Torts (5th ed), § 33, p 201, noted that " '[u]nder
all ordinary and normal circumstances, in the absence
of any reason to expect the contrary, the actor may
reasonably proceed upon the assumption that others
will obey the criminal law.' " "It is not necessary that
the manner in which a person might suffer injury be
foreseen or anticipated in specific detail." *Ross, supra*
at 188.

Plaintiffs rely, in part, on *Pamela L v Farmer*, 112
Cal App 3d 206, 207-209; 169 Cal Rptr 282 (1980),
where the California Court of Appeals reversed a

---

[6] In *Ross, supra* at 187, this Court stated that "we must determine
whether defendant had a duty to refrain from handing Anthony a loaded
weapon."

summary disposition granted in favor of the defendant wife, where the wife knew of her defendant husband's history of molesting women and children when she encouraged and invited the plaintiff minors to use the swimming pool at her house and told the minors' parents that it was safe for their children to play at her house while she was at work and her husband was home. The court ruled, in part, that if the allegations were true, the wife could have been held to have unreasonably exposed the minors to harm. *Id.* at 211. The court also ruled that "where the defendant, through his or her own action (misfeasance) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person[,]" liability may arise. *Id.* at 209. The principles enunciated in *Ross* parallel those in *Pamela L.*

Defendants rely on *Johnson v Detroit*, 457 Mich 695, 697, 699-700; 579 NW2d 895 (1998), in which the decedent committed suicide in a police station holding cell through use of exposed overhead bars that originally had been covered by mesh but were exposed because the mesh had been torn away and had not been repaired. Although the defendant was aware of the need to repair the problem, it had failed to do so. Our Supreme Court, rejecting the plaintiff's negligence claim, stated:

> In her negligence claim, the plaintiff has to establish that the defendant had a duty to this particular decedent, that it breached that duty by placing the decedent in the defective cell, and that the breach was a proximate and factual cause of the decedent's death. A defendant does not owe a duty to an unforeseeable plaintiff. In this case, plaintiff failed to present a genuine issue of material fact establishing the existence of a duty owed to plaintiff's decedent because defendants were actually unaware, and it was not reason-

ably foreseeable, that the decedent was suicidal before
placing him in the defective cell. . . .

   . . . [O]fficers testified that the decedent gave no indica-
tion that he was suicidal. Conversely, the plaintiff presented
nothing to refute this evidence and did not offer any evi-
dence that the suicide was reasonably foreseeable.

   Where the events leading to injury are not foreseeable,
there is no duty, and summary disposition is appropriate.
*Groncki v Detroit Edison Co*, 453 Mich 644, 657; 557 NW2d
289 (1996). In this case, the defendants had no notice that
the decedent might attempt suicide, and therefore they can-
not be held responsible for failing to prevent the decedent's
death. This death was not reasonably foreseeable. Tragic as
it was, defendants cannot be held responsible for the
unforeseen suicide of the plaintiff's decedent. [*Johnson*,
*supra* at 711-712.]

   *Johnson* leads to the issue whether Schmitz' per-
sonal history, which included depression, alcohol and
drug abuse, suicide attempts, anger management
problems, and sexual identity concerns, should be
taken into account in determining whether a violent
response was foreseeable, where there was no evi-
dence that defendants knew about Schmitz' personal
or psychiatric history.[7] The majority states, when it
does reach the issue of misfeasance, that "Schmitz
gave every appearance of being a normal, well-
adjusted adult who consented to being surprised on
the show by a secret admirer of unknown sex and
identity." *Ante* at 499. For the most part, I agree with
this statement.[8]

---

   [7] This evidence was presented to the jury through the testimony of
plaintiffs' experts and individuals with personal knowledge of Schmitz'
life, including his ex-girlfriend with whom he had lived.

   [8] There was some testimony presented that one of the show's produc-
ers was so annoyed by Schmitz' constant telephone calls before the show
that if Schmitz called one more time, the producer would smack him.

The matter presents a unique situation in the law regarding the foreseeability of third-party criminal acts because ordinarily one would not have the opportunity to look into the personal history of the criminal actor's life or even know who the criminal actor was going to be before the negligent act occurred; however, here the show knew that it was going to surprise Jonathan Schmitz and cause some type of emotional reaction before it proceeded with its intentional act. In *Johnson, supra,* where the Supreme Court relied on the lack of notice of suicidal tendencies, the police did not have the opportunity or ability to review the decedent's background, let alone know his identity, in order to make an assessment of any suicidal tendencies before arresting him and putting him in the holding cell, and to require the police to do so would be unreasonable; they were only able to assess any suicidal tendencies on the basis of his interaction with the police at the time of the arrest. In *Ross* and *Pamela L, supra,* the defendants knew of the criminal actors' personal history because the actors were family members.

The question should not involve whether the show must be required or has a duty to make an inquiry into the background of a particular person, the failure of which may result in liability, but rather whether defendants should be charged with the knowledge of the actual history for the purpose of foreseeability analysis.

I would hold that as a matter of public policy, if defendants, for their own benefit, wish to produce "ambush" shows that can conceivably create a volatile situation, they should bear the risk if a guest is psychologically unstable or criminally dangerous by

being charged with that knowledge in the context of any foreseeability analysis. " 'Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Terrien v Zwit*, 467 Mich 56, 68; 648 NW2d 602 (2002), quoting *Muschany v United States*, 324 US 49, 66; 65 S Ct 442; 89 L Ed 744 (1945). Analogous legal precedents form the basis of my public policy position.

In *Richman v City of Berkley*, 84 Mich App 258, 261; 269 NW2d 555 (1978), this Court stated that it "is a basic tort rule of law—a tortfeasor takes his victim as he finds him." In a separate dissenting opinion in *Pierce v Gen Motors Corp*, 443 Mich 137, 155-156; 504 NW2d 648 (1993), Justice Lᴇᴠɪɴ noted that all first-year law school students are taught that a tortfeasor takes his victim as he finds him as explained through the example of the man with an eggshell skull; one is responsible for the consequences of hitting a person on the head and cracking the skull even if the skull was weak to begin with and one gave only a slight blow as a joke. Finally, our Supreme Court in *Wilkinson v Lee*, 463 Mich 388, 396-397; 617 NW2d 305 (2000), quoting with approval 2 Restatement Torts, 2d, § 461, p 502, and the accompanying comment, stated:

"The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct."

"The rule stated in this Section applies not only where the peculiar physical condition which makes the other's injuries greater than the actor expected is not known to

him, but also where the actor could not have discovered it
by the exercise of reasonable care, or, indeed even where it
is unknown to the person suffering it or to anyone else until
after the harm is sustained. A negligent actor must bear the
risk that his liability will be increased by reason of the
actual physical condition of the other toward whom his act
is negligent."

I would apply these principles by analogy to the case sub judice. Although Amedure, through his estate, was the "victim" for purposes of the instant action, the alleged misfeasance was also directed at Schmitz, and on the basis of the very unique circumstances of this case, defendants should take Schmitz *as they found him*, making it appropriate to consider Schmitz' personal history in determining foreseeability. To rule otherwise would allow television, radio, or other media outlets to undertake similar actions as occurred here without limit and claim lack of foreseeability in the face of a civil action because they lacked knowledge concerning the history of a person they set up for ridicule. The *Wilkinson* Court concluded that "[t]he fact that this particular plaintiff was unusually vulnerable to head injuries does not relieve the defendants of responsibility for those damages." *Wilkinson, supra* at 397. Likewise, the fact that Schmitz was unusually vulnerable should not relieve defendants of their responsibility. For purposes of foreseeability analysis, defendants should be made to bear the risk where a guest is psychologically unstable or criminally dangerous and defendants acted intentionally in producing the show for their own benefit.

I am not asserting that defendants should not be allowed to produce shows of this kind, nor that they

must be required to make inquiry into the personal backgrounds of guests (although an industry practice to make minimal inquiry could be beneficial to all), but only that if they wish to produce "ambush" shows through the exploitation of guests, they must take those guests as they are.[9]

Considering the evidence in a light most favorable to plaintiffs, the show used lies, deceit, sensationalism, and outrageous behavior, while playing with human emotions, in order to orchestrate a grand surprise for the benefit of its audience and ratings, which caused Schmitz to suffer deep embarrassment, humiliation, and extreme anger. Taking into consideration Schmitz' personal mental frailties and dangerous inclinations, those circumstances could lead reasonable jurors to draw different conclusions regarding whether it was foreseeable that Schmitz would commit an act of violence against Amedure.[10] Therefore, resolution by the jury was appropriate.

In view of the majority's opinion to reverse on the basis of the "duty" issue, other than to record my disagreement with the analysis by the majority in this dissent, I see no value in attempting to address the other issues raised on appeal.

---

[9] If a show were to surprise a person about a spouse's infidelities, and the surprised spouse had a history of numerous convictions for felonious and brutal assaults against domestic partners, it would only be appropriate to attribute knowledge of that history to the producers of such a show where the unfaithful spouse is subsequently harmed by the surprised spouse because of the public revelation.

[10] The jury was also presented with expert testimony about the potential dangerous repercussions of producing shows of this nature and with testimony that warnings concerning these dangers were actually given to defendants before the taping of the show at issue.