# STATE OF MICHIGAN

# COURT OF APPEALS

---

APRIL WARDEN-PITTMAN, personal
representative of the ESTATE OF MONTRICE
COLEMAN,

        Plaintiff-Appellant,

v

CONNIE PANCOTTO and DOMINIQUE
PANCOTTO,

        Defendants-Appellees,

and

KINGSWOOD ESTATES SUBDIVISION
ASSOCIATION,

        Defendant.

UNPUBLISHED
December 15, 2016

No. 327005
Macomb Circuit Court
LC No. 2013-001939-NO

---

Before: GADOLA, P.J., and WILDER and METER, JJ.

PER CURIAM.

Plaintiff, as personal representative of the Estate of Montrice Coleman, appeals as of right an order dismissing her case, with prejudice, against defendants Connie Pancotto and Connie's daughter, Dominique (Nikki) Pancotto, individuals, and the Kingswood Estates Subdivision Association (Kingswood), an organization. Specifically, plaintiff challenges the trial court's earlier order granting summary disposition under MCR 2.116(C)(10) in favor of the Pancotto defendants[1] in this negligence action. We affirm.

---

[1] Although Kingswood also moved for summary disposition under MCR 2.116(C)(10), the trial court denied its motion. On appeal, plaintiff challenges only the motion for summary disposition granted in favor of the Pancotto defendants. Kingswood was later dismissed from the action by stipulation of the parties after the court approved a settlement agreement between plaintiff and Kingswood.

## I. BACKGROUND FACTS

This case arises from the drowning death of 16-year-old Montrice Coleman, which occurred during an afterschool party hosted by Nikki, then 16 years old, and her mother, Connie, at their home on Royal Lake in Shelby Township. Nikki had invited about 15 to 20 classmates, a number approved by Connie, and expected more to attend based on word-of-mouth invitations by her friends. Although Nikki did not personally invite Coleman, she invited her friend Miguel Hollingsworth, who was Coleman's best friend, and she remembered her friend Megan Darr, who was dating Coleman at the time, asking if he could come. Thus, she was not surprised when Coleman arrived at the party and she did not ask him to leave. Connie agreed to host the swimming party and borrowed life jackets from her neighbors in anticipation of the party to add to her personal collection of 15 life jackets. According to Darr, Coleman, who was not a strong swimmer, was encouraged to wear a life jacket, but he refused. Thereafter, Coleman attempted to swim out to a floating dock in the center of the lake, but he sank beneath the surface of the murky lake and ultimately drowned.

There is some dispute over the precise roles both Connie and Nikki played in the events leading up to Coleman's death. Importantly, Connie claimed at her deposition that, after realizing Darr was yelling for help for Coleman, she pulled a phone from her pocket while she stood knee-deep in the water and called 911. Connie also claimed that she stood at the shoreline from the time she heard Darr screaming until after she ended the 911 call. In contrast, she told the 911 operator that she checked the house for the missing boy, "opened the bathrooms," and located his cell phone. According to another party guest, Natalie Vamvas, Connie waited between 5 and 10 minutes after learning that a teen was missing before calling 911. Connie admitted in her deposition that she did not know how long it took her to call 911 after realizing that a teen was missing; however, she denied Vamvas's allegation that it had been up to 10 minutes, conceding only that it might have been "a minute or two" after she reached the shoreline that she called 911.

Both Connie and Nikki testified that Nikki was in the house when the drowning occurred. According to the Pancottos, once Nikki became aware of Coleman's disappearance, she ran outside the house and jumped into the lake to help search for Coleman at the location where Darr was marking the spot in the water. Darr agreed that Nikki arrived to help look for Coleman. Several of the teens testified that they thought Nikki was in the lake or was on the floating dock at some point around the time of Coleman's disappearance.

There is some dispute over whether and how Connie and Nikki informed the party guests that they were required to wear jackets in the lake, and over how many teens were actually wearing life jackets while swimming. Several of the teens who provided deposition testimony said that few, if any, of the teens in the water were wearing life jackets. The teens unanimously agreed that, although life jackets were readily available, neither Nikki nor Connie ever informed the teens that Kingswood required them to wear life jackets, asked them to get out of the water unless they wore a life jacket, or physically handed a life jacket to any party guest. Nikki admitted that she did not physically hand out life jackets and did not tell anyone that they had to get out of the lake if they were not wearing one.

Plaintiff, as personal representative of Coleman's estate, brought an action against Connie and Nikki, alleging both gross and ordinary negligence. The Pancotto defendants then moved for summary disposition on all of plaintiff's claims, which the trial court granted.

## II. DISCUSSION

Plaintiff first argues that the trial court erred when it granted the Pancotto defendants' motion for summary disposition after concluding that the recreational land use act (RUA), MCL 324.73301(1), barred plaintiff's claim against Connie for ordinary negligence and that plaintiff failed to make a prima facie showing of gross negligence with regard to Connie or ordinary negligence with regard to Nikki. We disagree with plaintiff.

### A. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co*, 489 Mich 157, 162; 809 NW2d 553 (2011). Below, the trial court granted the Pancotto defendants' motion for summary disposition pursuant to MCR 2.116(C)(10). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). When reviewing such a motion, courts consider the affidavits, pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the nonmoving party. *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009).

Whether the RUA applies to a given set of facts is a question of law that this Court reviews de novo. *Neal v Wilkes*, 470 Mich 661, 664; 685 NW2d 648 (2004). We also review de novo whether a defendant owed a duty of care in a negligence action. *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

### B. THE RECREATIONAL LAND USE ACT

Plaintiff first argues that the trial court erred when it determined that the RUA applied in this case to limit Connie's liability to that of gross negligence or willful and wanton misconduct. "The RUA exempts an owner of land from liability for injuries suffered by a person while that person is using the owner's land for specified purposes if that person has not paid the owner a valuable consideration for such use, unless the injuries were caused by the owner's gross negligence or willful and wanton misconduct." *Neal*, 470 Mich at 671. In pertinent part, MCL 324.73301(1) states the following:

> Except as otherwise provided in this section, a cause of action shall not arise for injuries to a person *who is on the land of another without paying* to the owner, tenant, or lessee of the land a valuable consideration *for the purpose of* fishing, hunting, trapping, camping, hiking, sightseeing, motorcycling, snowmobiling, *or any other outdoor recreational use* or trail use, with or without permission, against the owner, tenant, or lessee of the land unless the injuries were caused by the gross negligence or willful and wanton misconduct of the owner, tenant, or lessee. [Emphasis added.]

-3-

The application of the RUA is not "limited to vacant or undeveloped lands," and bars liability when land is used for recreational purposes even in "[u]rban, suburban, and subdivided lands" such as the property at issue here. *Neal*, 470 Mich at 665-666. In *Neal*, our Supreme Court explained the following:

> The RUA simply states that an owner of land is not liable to a person who injures himself on the owner's land if that person has not paid for the use of the land and that person was using the land for a specified purpose, unless the injuries were caused by the owner's gross negligence or willful and wanton misconduct. The statute contains no limitation on the type of land involved, but rather applies to specified activities that occur "on the land of another . . . ." MCL 324.73301(1). That is, the act limits its application to specified *activities*, but it does not limit its application to any particular type of land. Therefore, an owner is not liable to a nonpaying outdoor recreational user of his land, unless the user's injuries are caused by the owner's gross negligence or willful and wanton misconduct. [*Id*. at 667-668 (emphasis added).]

In this case, plaintiff does not dispute that Coleman was injured "on the land of another without paying to the owner . . . a valuable consideration," or that that Coleman was engaged in an outdoor recreational use of the land within the meaning of the RUA. See MCL 324.73301(1). Plaintiff also does not contest that this Court has previously concluded that swimming in a lake or pond is an "outdoor recreational use" for which liability for injury is limited by the RUA. See *Hill v Guy*, 161 Mich App 519, 521, 523-524; 411 NW2d 757 (1987). Rather, plaintiff focuses on the language in MCL 324.73301(1) that limits the RUA's protection to "the owner, tenant, or lessee of the land." According to plaintiff, because Connie failed to show that she owned the lake, i.e., "the land" on which Coleman suffered his injury, she was not entitled to protection under MCL 324.73301(1). We disagree.

The fact that Connie did not prove ownership of the specific part of the lake where Coleman drowned did not preclude application of the RUA in this case. Although a representative of the lake association stated that he did not know who "owned" the lake, he explained that only property owners directly adjacent to the lake are allowed to access the water. Therefore, Connie had a clear possessory interest in, and control over, Royal Lake. Additionally, plaintiff does not dispute that Connie owned the property directly adjacent to the lake where Coleman decided to forego use of a life jacket and enter the lake and where the alleged negligence occurred. Rather, plaintiff acknowledges that "[i]t is undisputed that [Coleman] was injured in the lake that is adjacent to the Pancotto property."

Plaintiff argues that this Court's opinion in *Duffy v Irons Area Tourist Ass'n*, 300 Mich App 542, 546; 834 NW2d 508 (2013), limited the application of the RUA when it noted that "[b]y repeatedly referring to the owner, tenant, or lessee of the land *on which the person is injured*, the Legislature plainly intended to limit the scope of the protection provided under MCL 324.73301(1)[.]" However, plaintiff misconstrues the holding of *Duffy*, which was intended to limit the application of the RUA to the actual owner, tenant, or lessee of the land on which a negligence action arose. In *Duffy*, the Court considered whether a tourist association under contract to care for part of the defendant's land could claim protection under the RUA. *Id*. at 544-546. This Court held that it could not, explaining as follows:

By repeatedly referring to the owner, tenant, or lessee of the land on which the person is injured, the Legislature plainly intended to limit the scope of the protection provided under MCL 324.73301(1): "a cause of action" by persons who were injured "on the land of another"—without paying to "the owner, tenant, or lessee of the land" a valuable consideration—shall not arise "against the owner, tenant, or lessee of the land" unless that person's injuries were caused "by the gross negligence or willful and wanton misconduct of the owner, tenant, or lessee." . . . As can be seen from a cursory reading, the Legislature took pains to state that it is the land owners, tenants, or lessees who cannot be liable unless the land owner, tenant, or lessee engaged in gross negligence or wanton and willful misconduct. It is also evident that the Legislature extended this protection to owners, tenants, and lessees because it is those persons or entities whose possession and control over the land renders them liable under the traditional common-law principles applicable to premises liability. [*Id*. at 546-547 (emphasis omitted).]

Accordingly, the Court used the language cited by plaintiff to emphasize that the property owner, tenant, or lessee was the only entity that could benefit from the RUA's protection, not to limit the RUA's application to those who could prove ownership of the precise point of property where an injury occurred. Plaintiff asks us to read a requirement into the RUA that simply is not there. This would be inappropriate, particularly in light of *Duffy*, in which this Court emphasized:

[O]ur Supreme Court has disavowed this type of "legislative decision-making" by the courts when interpreting the recreational land use act. Instead, our Supreme Court has held that the recreational land use act should be enforced *as written* and not given a judicial gloss designed to promote what the court believes to be the Legislature's policy goal in enacting the statute. [*Id*. at 548 (citations omitted).]

Nothing in the plain language of the RUA limits its protections to the owner of "the land on which the plaintiff is injured." In fact, in a dated, but still persuasive, opinion, this Court considered a factual scenario very similar to the one presented here and concluded that the RUA's protection extended to the owners of property adjoining a body of water even when the actual injury occurred within the body of water. *James v Leco Corp*, 170 Mich App 184, 190-191; 427 NW2d 920 (1988). In *James*, the plaintiffs' decedents used the defendant's beachfront property to access a pier before being swept away by high waves, suffering death. *Id*. at 186-187. The *James* plaintiffs argued that the RUA did not apply "because their decedents were not injured on [the] defendant's land, but rather were injured while on the end of the government's pier attached to, but away from, [the] defendant's land." *Id*. at 189. The *James* Court disagreed, holding the following:

Clearly, plaintiffs' decedents used defendant's property for recreational purposes, traversing it in order to walk on the pier. Plaintiffs have alleged that it was this use of "the lands of another," in this case defendant's property, that was in fact the proximate cause of their decedents' deaths.

\* \* \*

-5-

> We hold that the recreational use statute applies to plaintiffs' cause of action for injuries alleged to be proximately caused by use of defendant's land. [*Id*. at 190-191.]

Like the decedents in *James*, Coleman used Connie's land to enter the water, and clearly entered Connie's property for the purpose of engaging in a recreational use of that land. Therefore, the trial court did not err by concluding that the RUA applies in this case to limit Connie's liability to that of gross negligence or willful and wanton misconduct. Further, because plaintiff has not presented any evidence of "willful and wanton misconduct," which is established when "the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does," *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 386; 838 NW2d 720 (2013) (quotation marks and citations omitted), the RUA limits plaintiff's claim against Connie to gross negligence.

### C. GROSS NEGLIGENCE AS TO CONNIE PANCOTTO

Plaintiff contends that the trial court erred when it determined that plaintiff had not alleged facts to support a gross negligence claim against Connie. Again, we disagree. Gross negligence is conduct that is so reckless that it demonstrates a substantial lack of concern for whether an injury results. *Xu v Gay*, 257 Mich App 263, 269; 668 NW2d 166 (2003). The gross negligence standard suggests "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his [or her] charge." *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). The issue of gross negligence may be determined by summary disposition only if reasonable minds could not differ. *Jackson v Saginaw Co*, 458 Mich 141, 146; 580 NW2d 870 (1998).

No reasonable person could conclude that Connie exhibited a substantial disregard for the safety of the party guests, including Coleman. Rather, the facts indicate that Connie went out of her way to ensure that she would have extra life jackets available for the party and to inform the guests that they should wear life jackets. Although Connie admitted that she did not personally hand a life jacket to each party guest, her failure to do so was not grossly negligent. As this Court has explained, "[e]ven the most exacting standard of conduct, the negligence standard, does not require one to exhaust every conceivable precaution to be considered not negligent." *Tarlea*, 263 Mich App at 90. No reasonable person observing Connie's actions on the day of the incident would conclude that Connie "simply did not care about the safety or welfare," *id.*, of the teens swimming in the lake.

Plaintiff suggests that the evidence, appropriately construed in a light most favorable to plaintiff, proves that Connie waited an unreasonable amount of time before calling 911 after she realized that one of the teens was missing. Specifically, Vamvas alleged that she and Darr shouted for almost 10 minutes before Connie called 911. According to plaintiff, this failure to act within a reasonable time illustrated "a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Id*. Even accepting Vamvas's allegation as true, it would not prove that Connie exhibited gross negligence because there is no evidence that Connie knew Coleman was drowning during this time period. There is also no evidence that any of the teens successfully communicated Coleman's dire circumstances to Connie and Connie

refused to believe them. Although Connie's alleged delay might be considered "unreasonable," raising issues of ordinary negligence, "[e]vidence of ordinary negligence is insufficient to create a material question of fact regarding the existence of gross negligence." *Woodman v Kera, LLC*, 280 Mich App 125, 152; 760 NW2d 641 (2008). No reasonable trier of fact could conclude that Connie's alleged delay in calling for emergency help displayed conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.[2]

### D. NEGLIGENCE AS TO NIKKI PANCOTTO

Next, plaintiff argues that the trial court erred when it determined that no genuine issue of material fact existed with regard to whether Nikki was liable for Coleman's death. We disagree with plaintiff.

At the outset, we note that the trial court erred when it determined the issue of Nikki's negligence before deciding whether Nikki owed Coleman any duty of care. A prima facie case of negligence requires the establishment of four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages. *Henry v Dow Chem Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). "Duty" is a legally recognized obligation "to conform to a particular standard of conduct to protect others against unreasonable risks of harm." *Burnett v Bruner*, 247 Mich App 365, 368; 636 NW2d 773 (2001) (quotation marks and citation omitted). Ordinarily, whether a duty exists is a question of law for the court. *Id*. "[O]nce a standard of conduct is established, the reasonableness of an actor's conduct under the standard is a question for the factfinder, not the court." *Tallman v Markstrom*, 180 Mich App 141, 144; 446 NW2d 618 (1989). Here, the trial court erred when it failed to identify a duty owed by Nikki, instead engaging in a reasonableness determination that turned on facts that were somewhat in dispute. However, the error was harmless because Nikki did not owe Coleman a duty of care and summary disposition was appropriate. *Beaudrie v Henderson*, 465 Mich 124, 130; 631 NW2d 308 (2001).

Plaintiff asserts that, by choosing to host a swimming party, Nikki owed Coleman and the rest of her guests a duty to act reasonably in that undertaking. In addition, plaintiff suggests that Nikki owed Coleman a duty in premises liability to warn Coleman of a dangerous drop off in Royal Lake that was known to Nikki. "Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land." *Buhalis v Trinity Continuing Care Servs*, 296 Mich App 685, 692; 822 NW2d 254 (2012). A claim can have elements sounding in both premises liability and ordinary negligence. *Laier v Kitchen*, 266 Mich

---

[2] Plaintiff argues that the affidavit of aquatics expert Dr. Ralph Johnson established that Connie was grossly negligent; however, expert witnesses may not draw legal conclusions and they "may not give testimony regarding a question of law, because it is the exclusive responsibility of the trial court to find and interpret the law." *Carson Fischer Potts & Hyman v Hyman*, 220 Mich App 116, 122-123; 559 NW2d 54 (1996). Because the circumstances of this case did not give rise to sufficient indicia of gross negligence to create a genuine issue of material fact, the trial court was permitted to conclude that Connie was entitled to summary disposition as a matter of law. Johnson's legal conclusions were irrelevant to the trial court's determination in this regard.

App 482, 493, 497; 702 NW2d 199 (2005). This Court is not limited by plaintiff's failure to clearly articulate the duties allegedly owed by Nikki to Coleman. See *David v Sternberg*, 272 Mich App 377, 381; 726 NW2d 89 (2006) ("It is well established that the gravamen of an action is determined by reading the claim as a whole and looking beyond the procedural labels to determine the exact nature of the claim.") (quotation marks, citations, and brackets omitted). Accordingly, we will address whether Nikki owed Coleman a duty of care in the context of both ordinary negligence and premises liability.

### 1. ORDINARY NEGLIGENCE

Plaintiff argues that Nikki, in taking the affirmative action of hosting a swimming party, had a duty to exercise reasonable care to avoid harm to her guests. It is true that "[e]very person who engages in the performance of an undertaking has an obligation to use due care or to act so as not to unreasonably endanger the person or property of another." *Laier*, 266 Mich App at 494 (quotation marks and citation omitted). "However, as a general rule, there is no duty that obligates one person to aid or protect another." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012) (quotation marks and citation omitted). As this Court has explained:

> "In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another."
>
> "Social policy, however, has led the courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant. . . . The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety." [*Graves v Warner Bros*, 253 Mich App 486, 493-494; 656 NW2d 195 (2002), quoting *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988).]

"Such a special relationship must be sufficiently strong to require a defendant to take action to benefit the injured party." *Graves*, 253 Mich App at 494 (quotation marks and citation omitted). These relationships include "a common carrier that may be obligated to protect its passengers, an innkeeper his guests, an employer his employees, owners and occupiers of land their invitees, a doctor his patient, and business invitors or merchants their business invitees." *Id*.

Plaintiff insists that Nikki owed Coleman a duty of care. However, plaintiff has not identified an affirmative action undertaken by Nikki that might have caused Coleman's death. Instead, plaintiff notes that Nikki did not warn Coleman of a dangerous drop-off in the lake, did not inform Coleman that Kingswood required all swimmers, regardless of skill, to wear a life jacket in the lake, and did not personally hand Coleman a life jacket and force him to put it on.

These are not affirmative acts leading to harm, but failures to intervene to protect Coleman from the dangers inherent in swimming, an act voluntarily undertaken by Coleman himself.

The failure to act—nonfeasance—cannot form the basis of liability in the absence of a special relationship, *Downs v Saperstein Assoc Corp*, 265 Mich App 696, 701; 697 NW2d 190 (2005), and plaintiff fails to argue that Nikki and Coleman had any special relationship imposing an affirmative duty on Nikki to act on behalf of Coleman. Plaintiff suggests that Nikki, as the host of a social gathering, had an affirmative duty to guarantee the safety of her party guests. However, we are unable to find any caselaw in which this Court has required a social host to affirmatively act to prevent harm to his or her guests and public policy counsels against the imposition of such a duty. Ordinary social guests, such as Coleman, must take responsibility for their own safety, and do not entrust themselves to the control and protection of another, with a consequent loss of control to protect themselves. The relationship between social hosts and guests is not in the same category as those relationships in which this Court has determined that enough control is transferred to impose liability for injury. See *Graves*, 253 Mich App at 494. Nikki, as a mere social host, did not owe Coleman a duty to keep him safe from injury. Therefore, summary disposition on plaintiff's ordinary negligence claim was appropriate.

## 2. PREMISES LIABILITY

Plaintiff also claims that Nikki had a duty to warn Coleman of a dangerous drop-off in the lake and breached that duty by failing to do so. As previously discussed, "[w]hen an injury develops from a condition of the land, rather than emanating from an activity or conduct that created the condition on the property, the action sounds in premises liability." *Woodman*, 280 Mich App at 153. In a premises liability action, "liability arises solely from the defendant's duty as an owner, possessor, or occupier of land." *Jahnke v Allen*, 308 Mich App 472, 475; 865 NW2d 49 (2014) (quotation marks and citation omitted). The precise duty of care owed by a premises possessor depends on whether the injured party is classified as a trespasser, a licensee, or an invitee. *James v Alberts*, 464 Mich 12, 19; 626 NW2d 158 (2001).

Social guests, such as Coleman in this case, are licensees who are "privileged to enter the land of another by virtue of the possessor's consent," *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596; 614 NW2d 88 (2000), and "who assume the ordinary risks associated with their visit," *James*, 464 Mich at 19 (quotation marks and citation omitted). In general, a premises possessor "owes a licensee a duty only to warn the licensee of any hidden dangers the [premises possessor] knows or has reason to know of, *if the licensee does not know or have reason to know of the dangers involved*." *Stitt*, 462 Mich at 596 (emphasis added). However, perfection is "neither practicable nor required by the law, and [u]nder ordinary circumstances, the overriding public policy of encouraging people to take reasonable care for their own safety precludes imposing a duty on the possessor of land to make ordinary [conditions] foolproof." *Hoffner v Lanctoe*, 492 Mich 450, 460; 821 NW2d 88 (2012) (quotation marks and citation omitted).

In her deposition, Nikki acknowledged that the lake water in Royal Lake dropped off suddenly from knee or hip level to over-head level, and that the drop-off could not be seen from above the water. Although whether Nikki informed Coleman of the drop-off is disputed, it is undisputed that Coleman knew about the drop-off before he decided to swim in the lake. Darr testified that she and Nikki discussed the drop-off in Coleman's presence. Darr then swam out to the drop-off, tested it, and swam back to warn Coleman before accompanying him on his swim

to the floating dock. Additionally, Hollingsworth testified that he personally stopped at the drop-off, pointed it out to Coleman, and suggested that Coleman stay at the shore. Plaintiff presented no evidence contesting Coleman's knowledge of the drop-off. Coleman's girlfriend and best friend, both of whom were with Coleman up until the drowning, testified that he was aware of the drop-off, and no one testified to the contrary. Because Coleman, a social guest, was aware of the potentially dangerous condition of the lake, Nikki had no duty to protect Coleman or offer him an additional warning. Therefore, the trial court properly granted summary disposition in favor of Nikki on plaintiff's premises liability claim.

Affirmed.

/s/ Michael F. Gadola
/s/ Kurtis T. Wilder
/s/ Patrick M. Meter