*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MD HOLDINGS, LLC, JOHN ALESI, JEREMY
STEINER, and EVERWORKS, INC.,

UNPUBLISHED
October 27, 2022

　　　　Plaintiffs-Appellants/Cross-Appellees,

v

No. 357462
Oakland Circuit Court
LC No. 2020-181300-CB

R. L. DEPPMANN COMPANY,

　　　　Defendant-Appellee/Cross-Appellant,

and

LEE & ASSOCIATES OF MICHIGAN, LLC, and
LARRY KELLY,

　　　　Defendants.

Before: RONAYNE KRAUSE, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

In this dispute arising out of the sale of commercial real estate, plaintiffs challenge the trial court order granting summary disposition in favor of defendant R. L. Deppmann Company.[1] Defendant filed a cross-appeal challenging the trial court's failure to award it costs and attorney fees as sanctions. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2018, plaintiffs were seeking suitable commercial property in which to conduct business. Plaintiffs learned of the subject commercial property in Southfield, which was owned by

---

[1] In a separate order, the trial court dismissed defendants Lee & Associates and Larry Kelly. Plaintiffs do not challenge that order on appeal. Because defendants Lee & Associates and Kelly are not involved in this appeal, we will refer to R. L. Deppmann Company as "defendant."

defendant. On April 30, 2018, the parties entered into a purchase agreement, which was subject to two amendments. Of significance, the agreement contained the following provisions:

15. It is understood that the Property is being purchased in its present condition and that it will be delivered by the Seller to the Purchaser in substantially the same condition as when this Agreement was made reasonable wear and tear and damage by the elements excepted.

**ADDITIONAL CONDITIONS:**

16. Purchaser shall have a period ("Inspection Period") of (60) days from the Date of this Agreement to inspect the Property and to satisfy, in Purchaser's sole and absolute discretion, the following conditions:

a) The obtaining by Purchaser of a satisfactory commitment for mortgage financing in such amount and containing such terms and provisions as are acceptable to Purchaser.

b) Purchaser's satisfaction with all aspects of the physical and structural condition of the Property.

c) Purchaser's satisfaction with the present zoning of the Property and obtaining all governing entities['] approval to use the property for its intended use.

d) Purchaser's obtaining and being satisfied with the results of a Phase I Environmental Assessment of the Property.

\* \* \*

23. **Survival of Representation and Warranties:** The representations and warranties as set forth in this Agreement shall be continuing and survive the Closing.

\* \* \*

28. **No Knowledge of Proceedings:** Seller represents and warrants that it has no knowledge of any judicial or administrative proceedings pending or threatened against the real estate and Seller is not aware of any facts which might result in an action, suit or other proceedings.

\* \* \*

37. **"As-is" Condition.** Purchaser warrants and acknowledges to, and agrees with, Seller that Purchaser is a sophisticated purchaser, has a 60 day inspection period to satisfy itself, and that Purchaser is purchasing the Property "AS IS", "WHERE IS" and "WITH ALL FAULTS" with no right of set-off or reduction in the Purchase Price.

In the second amendment, the parties agreed to, among other things, an additional two-week inspection period beyond the 60-day inspection period to address the environmental and appraisal contingencies. Notably, plaintiffs also expressly agreed that they were "satisfied with all other conditions of the property." The parties closed on the sale of the property on July 26, 2018.

After plaintiffs purchased the property, they encountered difficulty obtaining an occupancy permit for the premises, principally because the physical state of the property did not match the approved site plan with the city. For instance, the approved site plan from 1980 showed that the property had 26 parking spots and approximately 4,000 square feet of office space, but the property actually had 45 parking spots and approximately 6,000 square feet of office space. The differences were attributable to improvements that were previously made without obtaining permits or approvals from the city of Southfield. Plaintiffs' lawsuit was premised on defendant knowing about these nonconformances and not disclosing them.

In lieu of filing an answer, defendant moved for summary disposition under MCR 2.116(C)(8) or MCR 2.116(C)(10). The trial court granted the motion. With respect to the breach-of-contract claim, the court concluded that there was no evidence that defendant was aware of any facts at the time of the sale that might result in an action, suit, or other proceedings. Although defendant's representatives *currently* recognized that the 1980 site plan differed from the present-day physical appearance of the property, they denied being aware that any changes to the property were made without the city's approval. The trial court also dismissed plaintiffs' tort claims because they were barred by the economic-loss doctrine. In other words, the court ruled that plaintiffs failed to allege any fraud or misrepresentations that were factually distinguishable from their breach-of-contract claims. The trial court also concluded that because there were no valid underlying torts, plaintiffs' claim of civil conspiracy also failed.

## II. PLAINTIFFS' APPEAL

Plaintiffs challenge the trial court's grant of summary disposition in favor of defendant on most of their claims.[2] We review a trial court's decision on a motion for summary disposition de novo. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008).

## A. BREACH-OF-CONTRACT CLAIM

Plaintiffs argue that the trial court erred by granting summary disposition in favor of defendant on their breach-of-contract claim. We disagree.

Although defendant's motion for summary disposition was brought under both MCR 2.116(C)(8) and MCR 2.116(C)(10), because the parties relied on materials outside the pleadings, the trial court granted the motion with respect to the breach-of-contract count under MCR 2.116(C)(10). See *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008) ("Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and the trial court relied on matters outside the pleadings, . . . MCR 2.116(C)(10) is the appropriate basis for review."). "A motion under MCR 2.116(C)(10) tests the

---

[2] Plaintiffs do not challenge the dismissal of their breach-of-warranty claim in Count II.

factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). A motion under MCR 2.116(C)(10) is properly granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Michalski v Bar-Levav*, 463 Mich 723, 730; 625 NW2d 754 (2001).

Plaintiffs' breach-of-contract claim is based on a purported violation of ¶ 28 of the purchase agreement, which states:

> 28. **No Knowledge of Proceedings:** Seller represents and warrants that it has no knowledge of any judicial or administrative proceedings pending or threatened against the real estate and Seller is not aware of any facts which might result in an action, suit or other proceedings.

Plaintiffs aver that defendant breached this portion because it failed to disclose facts of which it was aware that might result in an action, suit, or other proceedings. In particular, plaintiffs contend that Robert Schmitt, defendant's vice president of finance, knew as of 2011 that the parking lot did not conform to the 1980 site plan, which directly contradicts defendant's assertion in ¶ 28 that it possessed no such knowledge.[3]

There is no factual dispute that the most current, approved site plan is the 1980 site plan. There also is no dispute that this site plan calls for approximately 30 parking spots on the property.[4] Further, there is no dispute that at the time of the sale in 2018, the parking lot actually had 45 parking spots. The parties agree that, at some point, defendant had the extra parking spots added without obtaining approval from Southfield. However, it is unknown when this revision to the parking lot occurred. Jan MacDonald, who had been an employee of defendant since 1978, testified that she was aware that some changes occurred in the north parking lot, but it did not seem that its condition changed much at all. Indeed, MacDonald thought that the essential condition of the lot had remained the same since 1980. Finally, there is no dispute that no one ever informed plaintiffs about any such discrepancies before the sale closed.

---

[3] The parties have accepted that having knowledge of a condition of the property that differs from an approved site plan could result in an action, suit, or other proceedings. Because no party has taken a contrary view, we will accept this premise for purposes of this issue.

[4] Although Schmitt testified that he counted 31 spots on the site plan, the plan itself states that there are "26" spots. The scanned copy of this 1980 document is not clear and difficult to read. Indeed, it appears from our review of the document that there may be 29 parking spots (12 in the southern lot and 17 in the northern lot—one row of six, one row of eight, and an extra three abutting the northern property line). Regardless, it is undisputed that the 1980 site plan contains substantially less parking spaces than are currently in existence.

Plaintiffs argue that there is a factual dispute regarding whether Schmitt had knowledge of the property's discrepancies from the approved site plan. Schmitt denied knowing that there were any discrepancies until this lawsuit was filed. He explained that the property remained unchanged during his entire time with the company.[5] The main evidence on which plaintiffs rely to contradict Schmitt's asserted lack of knowledge is a May 25, 2011 e-mail Schmitt received from the city of Southfield that contained as attachments the 1980 site plan and an aerial photograph of the premises.

In 2011, Schmitt was responsible for a project that involved tearing up, repaving, and restriping defendant's entire parking lot. Because Schmitt thought that the project would require the pulling of permits, he inquired of the contractor, Alan's Asphalt, to ensure that permits were pulled. Although Schmitt did not recall asking MacDonald to do any work on facilitating the obtaining of a permit, MacDonald received an e-mail from Sarah Mulally, Southfield's Senior Planner in the Planning Department, on May 24, 2011, at 3:01 p.m. Mulally's e-mail contained no message in the body of the e-mail, but denoted "site plan & aerial photograph" in the subject line. The e-mail contained two attachments—one was a scanned copy of the 1980 site plan, and the other was a current aerial view of the premises.

At 3:04 p.m., and with no explanatory text, McDonald forwarded the e-mail and attachments to Schmitt, and at 3:20 p.m., Schmitt forwarded the e-mail and attachments to Chuck Chambers, a representative of Alan's Asphalt. Schmitt stated in his e-mail:

> Attached are the plans the City of Southfield sent over to us in the event that they would be of any use when you talk to them.

At his deposition, Schmitt acknowledged that having now examined the aerial photograph from the 2011 e-mail and the 1980 site plan, he could see there were differences between the two documents. Most identifiable was the difference in the number of parking spots, with the current situation exceeding the amount specified in the site plan. But Schmitt maintained that he was not aware at the time of the sale of any discrepancies between the two versions.

The trial court properly ruled that there was no evidence to show that Schmitt was aware of any facts at the time of the sale that might result in an action, suit, or other proceeding. Although it was undisputed that Schmitt had received a copy of the site plan and a conflicting aerial photograph in 2011, he testified that he did not notice any discrepancies between the documents. And importantly, it is evident that any discrepancies between the two documents were not readily identifiable. Indeed, with the poor quality of the site plan that was contained in the e-mail, it is difficult to see how anything of substance could have been gleaned from it. For instance, the text on the left side of the site plan stating the number of parking spots is wholly illegible, and the area to the right (or north) is washed out, removing any detail, making it virtually impossible to have been able to count all the parking spots, especially the extra three along the north property line that plaintiffs' counsel brought to Schmitt's attention during his deposition. Importantly, it is *this*

---

[5] It is unclear from the record when Schmitt started working for defendant, but it appears from the testimony of other witnesses that he started at the company sometime between 2004 and 2009.

precise document that Schmitt received in 2011, and not any of the other, clearer site plans that have been submitted in this action.

Moreover, assuming that the site plan provided to Schmitt in 2011 was legible, plaintiffs have not offered any evidence to show that Schmitt noticed any discrepancies. Schmitt testified that he had asked Alan's Asphalt to procure the necessary permits for the job. Schmitt's e-mail to Chuck Chambers at Alan's Asphalt is consistent with that goal. When Schmitt forwarded the e-mail to Alan's Asphalt, just 16 minutes after receiving it himself,[6] he stated, "Attached are the plans the City of Southfield sent over to us in the event that they would be of any use when *you* talk to them."[7] (Emphasis added.) This does not show that any serious analysis of the documents took place and instead just shows that he forwarded them in case Alan's Asphalt needed them. Also, none of the e-mail communications from Mulally to MacDonald, or from MacDonald to Schmitt, mentioned or expressed any concern about any deviations from what was shown in the aerial photograph and what was specified in the site plan. In short, there is no evidence to show that Schmitt was aware of any such discrepancies. Merely showing that Schmitt had possession of the potentially conflicting documents is not enough. While this might be sufficient if the discrepancies were obvious or patent upon observation, that is not the case with this drawing and photograph. One has to meticulously examine and compare the documents to discern any differences; the differences are not apparent upon casual inspection. And there is nothing to suggest that Schmitt had engaged in anything other than a casual review of the e-mail. Indeed, had we not known from Mulally's September 19, 2018 e-mail to plaintiffs that the altered parking

---

[6] Although Schmitt forwarded the e-mail to Alan's Asphalt 16 minutes after it was received by him, it is unknown when Schmitt actually opened the e-mail.

[7] Plaintiffs suggest that Schmitt could not have asked Alan Asphalt's to procure the permit because the contract between Alan Asphalt's and defendant purportedly specified that obtaining the permit was defendant's responsibility. But even if such a term existed in their contract, it would not preclude Schmitt from still asking Alan Asphalt to obtain the permit. At the trial court, plaintiffs also submitted in response to defendant's motion for summary disposition an e-mail from Chuck Chambers to plaintiffs' counsel in which Chambers stated, "We were not involved in the permit process and do not recognize, and we were not privy to, anything you provided on this site map or permit. Permits would have been obtained by RL Deppmann, per our contract general conditions." However, this response cannot be considered when ruling on a motion for summary disposition. It involves Chambers's direct response to questions posed by plaintiffs' counsel, and it is not an affidavit. MCR 2.116(G)(4) provides that when responding to a motion brought under MCR 2.116(C)(10), the opposing party must "by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." Therefore, unsworn statements by a nonparty made to a party's attorney, in response to that attorney's questions, are not properly considered. See *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 120; 839 NW2d 223 (2013); *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 33; 772 NW2d 801 (2009); *Marlo Beauty Supply, Inc v Farmers Ins Group of Cos*, 227 Mich App 309, 321; 575 NW2d 324 (1998).

lot had been "cut" into the landscaping at some point, it is doubtful that we would have noticed that detail.[8]

There is also another barrier to plaintiffs' breach-of-contract claim succeeding. The claim is based on defendant having knowledge of facts that "might result in an action, suit or other proceedings." It is acknowledged that in conjunction with the repaving project in 2011, a permit was indeed pulled. While it is not clear who actually communicated with the city to obtain it, a permit nonetheless was obtained. Under the work description, the permit stated, among other things, "Final Inspection Required."[9] Because the permit was issued by the city and the work was completed, it is presumed that the final inspection did indeed occur since it was "required." There is no evidence of any issues being raised as a result of that inspection. Thus, no one at defendant company would have had any reason to think that anything was amiss with the present configuration of the parking lot. Put another way, even if someone knew that there was a discrepancy between the site plan and the actual configuration of the parking lot, when the property passed inspection after the 2011 project, a reasonable person would presume that any discrepancies were acceptable to the city and would not "result in an action, suit or other proceedings."

Therefore, with no evidence that Schmitt, or anyone else at defendant company, was aware of any discrepancies between the approved 1980 site plan and the condition of the property at the time of its sale, plaintiffs' breach-of-contract claim based on defendant's alleged breach of ¶ 28 of the purchase agreement fails, and the trial court did not err by granting defendant summary disposition on this count.

We disagree with plaintiffs' argument that summary disposition was improper because it was premature. Because plaintiffs never raised this argument in the trial court, it is unpreserved. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Unpreserved issues are reviewed for plain error affecting substantial rights. See *Veltman v Detroit Edison Co*, 261 Mich App 685, 690; 683 NW2d 707 (2004). " 'To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights.' " *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000) (citation omitted).

"Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete. However, summary disposition may nevertheless be appropriate if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position." *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 24-25; 672 NW2d 351 (2003) (citations omitted).

Plaintiffs have not shown any plain error. Importantly, they never argued in the trial court that the motion was premature and that it should be denied on that basis. Indeed, plaintiffs took

---

[8] Even then, it is difficult to identify all of the "cut[ting]" area, which appears to be along the eastern edge of the northern lot.

[9] Schmitt testified that the project was to repave the parking lot, but with the same striping and configuration that existed before.

the position that "Schmitt's deposition transcript alone defeats [defendant's] instant Motion on (C)(10) grounds, let alone when combined with Plaintiffs' supporting documentary evidence, attached hereto." Thus, given plaintiffs' position, the trial court did not err by failing to sua sponte address whether there was a reasonable chance that further discovery would uncover factual support for plaintiffs' position. See also *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003) (" 'A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court.' ") (citation omitted).

Moreover, plaintiffs have not shown that there was a reasonable chance that further discovery would uncover factual support for their position. Plaintiffs aver that it was likely that other officers of defendant company, including Norm Hall, would have known that the existing condition of the premises was not compliant with the approved site plan. But plaintiffs do not cite any evidence or testimony to explain why individuals like Hall would have possessed such knowledge. Merely being an officer in the company, or being involved in the marketing of the property for sale, is inadequate to show that there was a "reasonable chance" that the person would have known about any noncompliance issues. In any event, as already discussed, there was evidence that the parking lot had been in its present state since the 1980s.[10] Additionally, with the city of Southfield not lodging any complaints or objections after conducting a final inspection after the conclusion of the 2011 repaving and restriping permitted project, it is highly unlikely that anyone in 2018, the time of the sale, would have thought there were any facts that would give rise to any potential "action, suit or other proceedings."

Accordingly, the trial court did not err by failing to sua sponte deny defendant's motion for summary disposition on the basis that discovery had not yet been completed.

## B. TORT CLAIMS

Plaintiffs argue that the trial court erred by dismissing their tort claims on the basis of the economic-loss doctrine.

The trial court granted summary disposition in favor of defendant on plaintiffs' tort claims (Counts III-VI)[11] under MCR 2.116(C)(8), relying on the economic-loss doctrine. "A motion for summary disposition brought under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone. The purpose of such a motion is to determine whether the plaintiff has stated a claim upon which relief can be granted. The motion should be granted if no factual development could possibly justify recovery." *Beaudrie v Henderson*, 465 Mich 124, 129-130; 631 NW2d 308 (2001).

---

[10] Plaintiffs' own communication to Southfield even acknowledges that the parking lot had been in this very state for "more than twenty-five (25) years."

[11] The counts were fraudulent misrepresentation, silent fraud, negligent misrepresentation, and innocent misrepresentation.

"The economic loss doctrine provides that where a purchaser's expectations in a sale are frustrated because the *product* he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses." *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 43-44; 649 NW2d 783 (2002) (emphasis added, quotation marks and citation omitted). The doctrine "bars tort recovery and limits remedies to those available under the Uniform Commercial Code where a claim for damages arises out of the commercial sale of *goods* and losses incurred are purely economic." *Neibarger v Universal Coops, Inc*, 439 Mich 512, 515; 486 NW2d 612 (1992) (emphasis added).

This doctrine does not apply to the instant case, which does not involve the sale of goods. See MCL 440.2105(1) (defining "goods" as "all things . . . which are movable at the time of identification to the contract for sale"). The property involved in this case is commercial real estate that is not movable. Therefore, the trial court erred by relying on this doctrine, in name, in dismissing plaintiffs' claims. Notably, however, although defendant cited the "economic-loss doctrine" in its motion for summary disposition, it relied in part on our Supreme Court's decision in *Hart v Ludwig*, 347 Mich 559; 79 NW2d 895 (1956).[12] In *Hart*, the Court held: "As a general rule, there must be some active negligence or misfeasance to support a tort. *There must be some breach of duty distinct from breach of contract*." *Id*. at 563 (emphasis added). "[T]he threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 84; 559 NW2d 647 (1997). Further, in arguing for and against the motion, both parties focused on whether defendant had a separate and distinct duty apart from any contractual obligation. Thus, the erroneous use of the term "economic-loss doctrine" is not itself controlling. See *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710-711; 742 NW2d 399 (2007).

For plaintiffs' three misrepresentation claims, they alleged that defendant

materially misrepresented . . . that the Property had 6,000 square feet of compliant office space, that the Property possessed forty-five compliant parking spaces, that the Property could accommodate forty-five cars as-built, that the Property was ordinance-compliant, and that no occupancy permit would be required for Plaintiffs to use and occupy the Property.

Plaintiffs also alleged that these representations were false and that plaintiffs relied on them in purchasing the property.

When defendant moved for summary disposition, it did not challenge the sufficiency of the complaint with respect to any of the elements of fraudulent misrepresentation,[13] negligent

---

[12] Nowhere in *Hart* did the Court use the terms "economic" or "loss."

[13] The elements of fraudulent misrepresentation are:

"(1) the defendant made a material misrepresentation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive

misrepresentation,[14] or innocent misrepresentation.[15] Instead, defendant simply argued that such tort actions cannot be sustained because plaintiffs failed to allege that any representation was "extraneous" to any promises in the contract. We agree. Plaintiffs assert that their misrepresentation claims all alleged that misrepresentations were made *before* the execution of the purchase agreement,[16] and that these (false) representations induced plaintiffs to enter into the agreement. Indeed, claims of fraudulent inducement are considered "extraneous" to contractual promises. See *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 373; 532 NW2d 541 (1995) (" 'Such fraud [not fraud in the inducement] is not extraneous to the contractual dispute among the parties . . . . This did not induce the plaintiffs to enter into the original agreement nor did it induce them to enter into additional undertakings.' ") (citation omitted); cf. *id*. at 371 ("[C]ourts generally have distinguished fraud in the inducement as the only kind of fraud claim not barred by the economic loss doctrine."); *id*. (" 'Fraud in the inducement, however, addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort.' ") (citation omitted).

"However, a claim of fraud in the inducement, by definition, redresses misrepresentations that induce the buyer to enter into a contract but that do not in themselves constitute contract or warranty terms subsequently breached by the seller." *Id*. at 375. Plaintiff's allegations regarding ordinance compliance and occupancy permits specifically relate to the warranties in the contract under paragraph 16(c) ("Purchaser's satisfaction with the present zoning of the Property and obtaining all governing entities['] approval to use the property for its intended use."). Plaintiff's

---

assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." [*Bergen v Baker*, 264 Mich App 376, 382; 691 NW2d 770 (2004) (citations omitted).]

[14] "A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 621; 769 NW2d 911 (2009) (quotation marks and citation omitted).

[15] The elements of innocent misrepresentation are similar to fraudulent misrepresentation. However, innocent misrepresentation does not require proof of a fraudulent purpose or an intent on the part of the defendant that the misrepresentation be acted upon by the plaintiff. *M&D, Inc v WB McConkey*, 231 Mich App 22, 28; 585 NW2d 33 (1998). And it has the added elements that "an unintendedly false representation was made in connection with the making of a contract and that the injury suffered as a consequence of the misrepresentation inure to the benefit of the party making the misrepresentation." *Id*. "Finally, in order to prevail on an innocent misrepresentation claim, a plaintiff must also show that the plaintiff and defendant were in privity of contract." *Id*.

[16] Although the complaint alleged that these misrepresentations occurred before *closing*, because all well-pleaded factual allegations are to be construed in a light most favorable to the nonmovant, *Mays v Governor*, 323 Mich App 1, 56; 916 NW2d 221 (2018), aff'd 506 Mich 157 (2020), and because the time before the *agreement* was executed necessarily is a subpart of the time before closing, the allegations can be considered as alleging preagreement conduct.

allegations regarding the square footage and number of parking spaces were based on a unilateral mistake of defendant's, as discussed above. A unilateral mistake is insufficient to modify or reform a previously negotiated agreement. *Casey v Auto Owners Ins Co*, 273 Mich App 388, 398; 729 NW2d 277 (2006); *Hilley v Hilley*, 140 Mich App 581, 585-586; 364 NW2d 750 (1985). Moreover, "there cannot be any fraud if the party allegedly defrauded had the means to determine for him- or herself the truth of the matter." *Alfieri v Bertorelli*, 295 Mich App 189, 194-195; 813 NW2d 772 (2012). This rule is not absolute, but rather, applies when the plaintiffs "were either presented with the information and chose to ignore it or had some other indication that further inquiry was needed." *Id*. at 195 (quotation marks and citation omitted). Here, plaintiffs had access to the 1980 site plan. Plaintiffs could have discovered the discrepancies in square footage and parking spaces.

Therefore, because the misrepresentation claims alleged in Counts III, V, and VI do not allege conduct extraneous to the contractual obligations, the trial court properly dismissed the claims under MCR 2.116(C)(8) on the basis that they were indistinguishable from the contract claims.

The dissent concludes that summary disposition of plaintiff's innocent and negligent misrepresentation claims is improper based on an owner's affidavit executed by defendant's president for the purpose of obtaining title insurance. Although not addressed by the dissent, the purchase agreement included a "commitment for title policy" clause, requiring defendant to deliver to plaintiffs "a complete commitment for a policy of title insurance issued by First American" within 15 days of the execution of the purchase agreement. Thus, the owner's affidavit is incorporated by reference into the purchase agreement. See *Forge v Smith*, 458 Mich 198, 207; 580 NW2d 876 (1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together.")

As part of the purchase agreement, our analysis regarding the owner's affidavit remains the same. The owner's affidavit warranted that "the use of the Property is in compliance with all terms, conditions, covenants and/or restrictions affecting the Property . . . and there are currently no violations of any terms, conditions, covenants and/or restrictions affecting the property[.]" This is the same as the warranties provided in the purchase agreement, and therefore not extraneous to the contractual promises. Again, plaintiffs could have obtained the 1980 site plan from the city to discover any discrepancies. The purchase agreement provided plaintiffs with 60 days to conduct due diligence and ensure that zoning was proper, and stated that the property was sold "as is." "An 'as is' clause in the parties' contract constitutes persuasive evidence that the purchaser assumed the risk of loss." *Coosard v Tarrant*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357950); slip op at 7. The amendment to the purchase agreement extended the due-diligence period by two weeks for environmental and appraisal issues, but otherwise stated that plaintiffs were "satisfied with all other conditions of the property." Despite the assertion of plaintiff's counsel at oral argument, the purchase agreement provided that it was between sophisticated parties. The owner's affidavit was not signed until July 26, 2018, the same day as closing. Thus, based on these facts, plaintiffs could not have reasonably relied on the owner's affidavit, and their claims for innocent and negligent misrepresentation still fail. See *Foreman v Foreman*, 266 Mich App 132, 142; 701 NW2d 167 (2005) (reliance must be reasonable).

Plaintiffs also alleged a tort claim for silent fraud (Count IV). Plaintiffs alleged in their complaint that defendants had a legal duty to disclose that

> the Property's square feet was approved by Southfield, that the Property did not in fact possess forty-five compliant parking spaces, that the Property could not in fact accommodate forty-five cars as-built, that the Property was not in fact ordinance-compliant, and that an occupancy permit would in fact be required for Plaintiffs to use and occupy the Property.

Plaintiffs also alleged that despite having this legal duty to disclose, defendant did not make the disclosures, which in turn induced plaintiffs to purchase the property. Plaintiffs asserted that the failure to disclose was misleading because of defendant's representation that there were no known facts that would lead to an action, suit, or other proceedings.

> In order to maintain an action for silent fraud, the plaintiff must show that the defendant suppressed the truth with the intent to defraud the plaintiff and that the defendant had a legal or equitable duty of disclosure. . . . Thus, while duty is irrelevant in a fraud claim, it is relevant in a silent fraud claim and in order for the suppression of information to constitute silent fraud there must exist a legal or equitable duty of disclosure. [*Barclae v Zarb*, 300 Mich App 455, 477-478; 834 NW2d 100 (2013) (quotation marks, citations, and brackets omitted).]

Summary disposition was proper on this count because there is no duty independent from the contract to disclose. "Questions about whether a duty exists are for the courts to decide as a matter of law." *Graves v Warner Bros*, 253 Mich App 486, 492; 656 NW2d 195 (2002). The general rule of caveat emptor prevails in land sale agreements, which provides that there is no general duty to disclose. See *Christy v Glass*, 415 Mich 684, 695 n 7; 329 NW2d 748 (1982).[17] The only source for such a duty would be the parties' contract. Indeed, plaintiffs' complaint for this count mirrored the language from ¶ 28 of the purchase agreement, in which defendant represented that it was not aware of any facts that would lead to "an action, suit or other proceedings." Consequently, with no independent duty to disclose, apart from any contractual obligation, this tort claim must fail. See *Rinaldo's*, 454 Mich at 84 ("[T]he threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation."); *Hart*, 347 Mich at 563 ("There must be some breach of duty distinct from breach of contract."). Therefore, the trial court properly granted defendant's motion for summary disposition on this count.

---

[17] Although not applicable here, the Seller Disclosure Act (SDA), MCL 565.951 *et seq*., modified this common law, but only with respect to the sale of residential property. See MCL 565.952. The property at issue in this case is commercial, not residential, so the SDA does not apply.

## C.  CIVIL-CONSPIRACY CLAIM

Plaintiffs also argue that the trial court erred by dismissing their claim for civil conspiracy because there were valid, underlying torts.  Given our resolution of plaintiffs' other issues, we disagree.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins Co v Columbia Cas Ins Co*, 194 Mich App 300, 313; 486 NW2d 351 (1992).  But "[l]iability does not arise from a civil conspiracy alone; rather, it is necessary to prove a separate, actionable tort." *Swain v Morse*, 332 Mich App 510, 530 n 13; 957 NW2d 396 (2020) (quotation marks and citation omitted); see also *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003), aff'd 472 Mich 91 (2005).  The trial court relied on this latter principle to dismiss the civil-conspiracy count.  Because the court had previously determined that all of plaintiffs' other tort claims were not viable, it held that the claim of civil conspiracy must fail as well.  Based on our previous discussion, we agree.  Plaintiffs' tort claims were properly dismissed under MCR 2.116(C)(8) because there were no other underlying torts.

## III.  DEFENDANT'S CROSS-APPEAL

Defendant argues on cross-appeal that the trial court erred by failing to award it sanctions for plaintiffs' purportedly frivolous complaint.  We disagree.

On appeal, defendant argues that sanctions were warranted under MCR 1.109(E), MCR 2.625(A), and MCL 600.5961.  MCR 1.109(E) provides, in pertinent part:

> (5) *Effect of Signature*.  The signature of a person filing a document, whether or not represented by an attorney, constitutes a certification by the signer that:
>
> (a) he or she has read the document;
>
> (b) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and
>
> (c) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> (6) *Sanctions for Violation*.  If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees.  The court may not assess punitive damages.

-13-

(7) *Sanctions for Frivolous Claims and Defenses*. In addition to sanctions under this rule, a party pleading a frivolous claim or defense is subject to costs as provided in MCR 2.625(A)(2). The court may not assess punitive damages.

Thus, under MCR 1.109(E)(6), sanctions are appropriate when, among other things, the party had no reasonable basis to believe that the facts underlying the party's legal position were true or the party's legal position was devoid of arguable legal merit. See also *Ford Motor Co v Dep't of Treasury*, 313 Mich App 572, 589; 884 NW2d 587 (2015).

And MCR 2.625(A)(2) provides:

In an action filed on or after October 1, 1986, if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591.

In turn, MCL 600.2591 provides:

(1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

(2) The amount of costs and fees awarded under this section shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees.

(3) As used in this section:

(a) "Frivolous" means that at least 1 of the following conditions is met:

(*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(*iii*) The party's legal position was devoid of arguable legal merit.

(b) "Prevailing party" means a party who wins on the entire record.

Defendant glosses over the fact that it never moved for the imposition of sanctions against plaintiff under these rules. MCR 1.109(E)(7) relates to sanctions for frivolous claims and incorporates MCR 2.625(A)(2), which in turn conditions the award of such sanctions on (1) a party

-14-

filing a motion, and (2) the court finding that the action or defense was frivolous.[18]  Neither of these things occurred.

Instead of filing a dedicated motion for the award of attorney fees, defendant made two references to the recovery of attorney fees in its motion for summary disposition.  The first occurred in its introduction:

> Furthermore, given Plaintiffs' bad faith, the Court should award [defendant] the costs and fees it has been forced to incur in defendant against Plaintiffs' meritless lawsuit.

The other reference occurred in the conclusion:

> For the all foregoing reasons, [defendant] respectfully requests that the Court issue an order granting its Motion, thereby dismissing Plaintiffs' Complaint in its entirety, and awarding [defendant] its costs and fees and all other relief that is just and proper.

Without a separate motion, defendant failed to properly invoke any request for sanctions under MCR 1.109(E), MCR 2.625(A)(2), or MCL 600.2591.  Accordingly, the trial court did not err by failing to sua sponte address the issue.

Additionally, assuming a party could request sanctions through a different motion, what defendant "raised" in its motion for summary disposition was wholly inadequate to present the issue to the trial court.  Defendant cited no authority whatsoever for its request for costs and attorney fees.  This is contrary to MCR 2.119, which governs motion practice and provides that motions are to "state with particularity the grounds and authority on which it is based."  MCR 2.119(A)(1)(b).  Additionally, Michigan follows the "American rule" with respect to an award of attorney fees and costs.  *Haliw v Sterling Hts*, 471 Mich 700, 706; 691 NW2d 753 (2005).  "Under the American rule, attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award."  *Id*. at 707.  Thus, irrespective of the mandate of MCR 2.119(A)(1)(b), with the default situation being that no attorney fees are recoverable, it was incumbent upon defendant to cite a statute or court rule to invoke an exception to the American rule.  Because it did not cite any authority in support of its request for attorney fees, the trial court did not err by failing to award any fees.  See also *Walters v Nadell*, 481 Mich 377, 388; 751 NW2d 431 (2008) ("Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute.").

---

[18] MCL 600.2591 also notes that the recovery of any sanctions must be premised "[u]pon motion of any party."  MCL 600.2591(1).

## IV. CONCLUSION

We affirm the trial court order granting defendants summary disposition. We also affirm the trial court's failure to address the issue of attorney fees, let alone award them.

/s/ Kathleen Jansen
/s/ Christopher M. Murray